John J. CULLEN et al.

v.

TOWN COUNCIL OF the TOWN
OF LINCOLN.

No. 2001–212–M.P.

Supreme Court of Rhode Island.

April 12, 2004.

Stephen H. Burke, Providence, for Plaintiff.

Teresa Paiva Weed, for Defendant.

Present: WILLIAMS, C.J., FLANDERS, GOLDBERG, FLAHERTY, and SUTTELL, JJ.

## OPINION

WILLIAMS, Chief Justice.

This case is before the Court on a writ of certiorari directing the respondent, the Town Council of the Town of Lincoln (council) to deliver the record to this Court so that we may review its decision denying the petitioners', John J. Cullen and Roland Montigny (petitioners), application to tie into the sewer system of the Town of

Lincoln (town). Because the council failed to accompany its decision with adequate factual findings and legal conclusions, we remand the record to the council with instructions to make such findings and conclusions.

## I

### Facts and Travel[1]

The petitioners own a tract of land, known as Whipple Cullen Farm, in the town. With hopes of developing the tract into a residential subdivision (subdivision), the petitioners began the approval process outlined in G.L.1956 § 45–23–39(b), which requires people proposing major land developments and major subdivisions to obtain master plan approval, preliminary plan approval, and then final plan approval.[2] After receiving master plan approval from the planning board in 1998, the petitioners sought preliminary plan approval pursuant to § 45–23–41. To that end, petitioners requested approval to connect the proposed subdivision's sewer line to the town's sewer system.

By ordinance, application to connect to the town's sewer system must be made to the town's director of public works. Lincoln, Code of Ordinances ch. 19, art. II, § 19–96 (1990) (ch. 19, art. II is hereafter referred to as sewer ordinance). If the director of public works rejects the application, the property owner may appeal to the town sewer appeal board (appeal board), which in turn forwards its recommendation to the council for final determination. *Id.* at § 19–32.

In March 1999, petitioners met with then-director, Robert C. Schultz, P.E. (director), about their request to connect to the town's sewer system. Their plans proposed a sewer line that would discharge into a town pumping station, known as the Lower River Road pumping station (pumping station). Concerned about the pumping station's capacity to handle the additional effluent that the subdivision would generate, the director suggested three alternate routes for the subdivision's sewer lines. Each of the alternate routes would allow petitioners to tie into the sewer system, but would avoid connecting through the pumping station. Although the alternates would allow the subdivision effluent to be propelled by gravity rather than a pump, they apparently would require the lines to traverse designated wetlands. Thus, petitioners met with officials from the Department of Environmental Management (DEM) to discuss the alternates.

In a letter dated April 21, 1999, DEM informed petitioners that the proposed alternate routes would pass through and alter wetlands and, therefore, they would have to apply for DEM approval. The letter explained that "[t]hrough its review of an Application to Alter, the [DEM] would have to determine if the proposed alteration would result in a random, unnecessary, and/or undesirable alteration of a freshwater wetland * * *." DEM's determination would depend on whether and to what extent impacts to the wetlands have been avoided, whether the proposed routes "eliminate[ ] or minimize[ ] probable impacts to freshwater wetland functions and values, and the environmental, health, welfare and general well-being of the populance [*sic*]" and whether the proposed project would contribute to an adverse cumulative impact on the wetlands. The DEM estimated that the application pro-

---

1. Due to the absence of factual findings made by the council, many of the "facts" are taken from the parties' briefs.

2. The petitioners concede that they are required to abide by this three-step approval process.

cess would take eight to twelve months, but it did not intimate a likely outcome.

Believing they would not receive the necessary permits from DEM, petitioners moved forward with their application to connect the sewer lines through the pumping station as they originally had planned. The town denied petitioners' application, citing concerns over esthetics, environmental impacts and the pump station's ability to handle the subdivision's sewerage.[3] The denial letter also noted that petitioners still had not submitted a detailed analysis of the alternate routes.

The petitioners appealed the rejection of their application to the appeal board. The appeal board held two days of hearings, during which time various proponents and objectors testified on the matter. Ultimately, the appeal board recommended that the council grant petitioners' request to lay the sewer lines as they proposed and connect through the pumping station on the condition that petitioners provide certain upgrades to the pumping station. This decision was forwarded to the council for final determination.

The council reviewed petitioners' application at a town council meeting on February 20, 2001. David McCombs (McCombs), an engineer retained by petitioners, explained that the pumping station route was the best option because it did not require traversing wetlands. He explained that the pumping station was acting only at 34 percent capacity and, after accepting sewage from the subdivision, the capacity would only be at 60 to 65 percent. According to McCombs, the pumping station was designed to handle 280 homes,

but only 80 homes were connected to it at the time. Thus, he testified, with appropriate upgrades paid for by petitioners, the pumping station could handle the additional load. The town's engineer, Larry Smith (Smith), testified that he believed that alternate routes could be explored further. The council also heard testimony from citizens opposing and supporting petitioners' project due to environmental concerns.

After hearing all the testimony, Councilman Dennis Auclair[4] moved to reject petitioners' application to tie into the pumping station because "there are other alternate routes" available to petitioners that would allow them to tie into the sewer system without using the pumping station. The council unanimously approved the motion and denied the application. We granted a writ of certiorari to review the decision of the council.

## II

### Standard of Review

■ When reviewing a case before this Court on a writ of certiorari, we "scour the record to discern whether any legally competent evidence supports the lower tribunal's decision and whether the decision[-]maker committed any reversible errors of law in the matter under review." *Kent County Water Authority v. State (Department of Health)*, 723 A.2d 1132, 1134 (R.I.1999). "If legally competent evidence exists to support that determination, we will affirm it unless one or more errors of law have so infected the validity of the proceedings as to warrant reversal." *Id.*

---

3. During the application process, director Schultz left the town's employ. Assistant Town Engineer Lucinda M. Hannus authored the denial letter.

4. The relationship between Councilman Auclair and petitioner Cullen has long ago been flushed down the drain. *See Cullen v. Auclair*, 809 A.2d 1107 (R.I.2002) (per curiam) (involving Cullen's defamation and false light actions brought against Auclair).

## III

### Adequacy of the Decision

■ The petitioners first argue that the council's decision must be quashed because it is lacking sufficient factual findings and legal conclusions. We agree.

This Court has consistently held that municipal councils and boards acting in a quasi-judicial capacity must make findings of fact and conclusions of law to support their decisions. *E.g., Cranston Print Works Co. v. City of Cranston,* 684 A.2d 689, 691 (R.I.1996); *Sambo's of Rhode Island, Inc. v. McCanna,* 431 A.2d 1192, 1193 (R.I.1981); *Eastern Scrap Services, Inc. v. Harty,* 115 R.I. 260, 263, 341 A.2d 718, 720 (1975). These basic requirements "have to do with facilitating judicial review, avoiding judicial usurpation of administrative functions, assuring more careful administrative consideration, helping parties plan their cases for rehearings and judicial review, and keeping agencies within their jurisdiction." *Hooper v. Goldstein,* 104 R.I. 32, 44, 241 A.2d 809, 815 (1968). The absence of such findings and conclusions precludes judicial review of a council's decision. *Cranston Print Works Co.,* 684 A.2d at 691.

■ In determining whether the municipal body has complied with these basic requirements, this Court is concerned with the content, rather than the form, of the decision. *May–Day Realty Corp. v. Board of Appeals of Pawtucket,* 107 R.I. 235, 239, 267 A.2d 400, 403 (1970). A written decision, although strongly preferred, is not required. *See id.* What is required, however, is "the making of findings of fact and the application of legal principles in such a manner that a judicial body might review a decision with a reasonable understanding of the manner in which evidentiary conflicts have been resolved and the provisions of the * * * ordinance applied."

*Thorpe v. Zoning Board of Review of North Kingstown,* 492 A.2d 1236, 1237 (R.I.1985); *see also May–Day,* 107 R.I. at 239, 267 A.2d at 403.

■ The requirement that a municipal council's decision be accompanied by sufficient factual findings is especially important when evidentiary conflicts abound. It is only by making basic findings of fact that a reviewing court is able to determine how such conflicts were resolved. "[I]f a tribunal fails to disclose the basic findings upon which its ultimate findings are premised, we will neither search the record for supporting evidence nor will we decide for ourselves what is proper in the circumstances." *Hooper,* 104 R.I. at 44, 241 A.2d at 815. Although basic facts may not be implied, this Court may, "where appropriate, imply an ultimate finding from the action taken." *Id.* at 45, 241 A.2d at 816.

In *Cranston Print Works Co.,* 684 A.2d at 690–92, we were unable to review the Cranston Safety Services and Licenses Committee's (committee) rejection of the plaintiff's request to install two 30,000–gallon propane tanks on its commercial property. During the application process, citizens expressed safety concerns over the proposed location of the tanks, which was downstream from an "antiquated and deteriorating" dam. *Id.* at 690–91. At a final hearing on the application, the committee voted to deny the application after briefly discussing concerns over the proposed site and hearing the fire chief's opinion that "putting hazardous materials in front of that dam is playing with people's lives." *Id.* at 691. Despite the apparent reality that the committee based its rejection on safety concerns, we remanded the case with instructions to make required factual findings and legal conclusions. *Id.* at 692.

Here, as in *Cranston Print Works Co.,* the council failed to fulfill its basic obligation to provide findings of fact and a

legal basis for its decision. First, the only arguable finding of fact is councilman Auclair's statement during the meeting that "there are alternate routes." We, however, stop short of classifying this as a "finding" of the council. No other council member expressly voiced concurrence with that "finding" during the meeting. In fact, the meeting minutes report only that "*Councilor Auclair* noted that notwithstanding the testimony of all the residents, * * * there are other alternate routes to direct sewage to three other locations." (Emphasis added.) Thus, the record does not clearly reflect that the entire council adopted councilman Auclair's "finding." *See Cranston Print Works Co.*, 684 A.2d at 691 ("the *council's* 'determination must contain findings of fact which support the ultimate decision of the body' "). (Emphasis added.)

The second, and more problematic, deficiency in the council's decision is its failure to cite any provision of the town's ordinances, or any other legal authority for that matter, upon which it based its rejection. The problem with this omission is compounded when consulting the sewer ordinance itself. The sewer ordinance is devoid of any provision that expressly limits an applicant's ability to tie into the sewer system simply because there may be alternates to the route that the applicant proposed.

That is not to say that the town is powerless to control the manner in which an individual may tie into the sewer system. The General Assembly expressly granted the town council the right to regulate the construction of, and connection to, a sewer system. P.L. 1984, ch. 270.[5] Implicit in this delegation is the right of the town to control the manner in which a

proposed tie-in may proceed. The right to dictate the manner in which a proposed sewer tie-in should proceed may also be concomitant to the right of the town to regulate for the safety and welfare of its residents pursuant to the zoning enabling act. *See* G.L. 1956 § 45–24–30. Although it is undisputed that petitioners have a right to tie into the sewer system, the town council cannot be held hostage to petitioners' sewer system plans. The law would justify the rejection of a proposed tie-in if the council properly found that a particular plan would result in unreasonable and avoidable financial, safety and environmental concerns for the town.

Until such time as the council specifies its factual findings, and connects those findings to legal grounds for rejection, we are unable to determine whether the council's decision must be reversed for error of law.

## IV

### Alternate Routes

■ Although we are unable to reach the merits of the case at this time, we will address one issue that undoubtedly will arise as the council perfects its decision—the availability of alternate tie-in routes. Although the existence of alternatives alone may not be sufficient grounds to reject an application, that factor would weigh into the reasonableness of the council's rejection of an application to use a particular proposed route. The petitioners contend that the alternate routes suggested by the director are unavailable because they could not receive the requisite DEM permits. We are convinced, however, that because petitioners have neither applied for DEM approval, nor demonstrated that

---

5. Because of a publication error, P.L. 1984, ch. 270 appears on pages 1163–70 of the Public Laws of 1985.

such application would be futile, they have failed to demonstrate that the pumping station route is their only practical option for tying into the sewer system.

■ Generally, futility is considered to be an exception to the requirement that an individual obtain an agency's final decision before challenging governmental action under the Fifth Amendment Takings Clause to the United States Constitution, or a comparable state constitutional provision. *See Gilbert v. City of Cambridge,* 932 F.2d 51, 61 (1st Cir.1991). Although the concept of futility most often arises in the context of takings cases, we believe the logic supporting the doctrine requires that we view with skepticism petitioners' contention that the pumping station route was their only alternative.

Recognizing that futility is "far easier to conceptualize than to define," the First Circuit explained that futility may be established in special circumstances when a permit application is not a "'viable option'" or where the permitting authority has made it "'transparently clear'" that a permit application will not be granted. *Id.*

"There may be a further facet of the futility exception, applicable where the degree of hardship that would be imposed by waiting for the permit process to run its course is so substantial and severe, and the prospects of obtaining the permit so unlikely, that the property may be found to be meaningfully burdened and the controversy concrete enough to warrant immediate judicial intervention." *Id.* at 61 n. 5

■ Because of the clear preference for following the prescribed application process, a party seeking to bypass the permitting procedure bears the burden of establishing futility and any doubt must be resolved against that party. *Id.* at 61.

"Thus, although futility can excuse a plaintiff's eschewal of a permit application, the mere possibility, or even the probability, that the responsible agency may deny the permit should not be enough to trigger the excuse. * * * To come within the exception, a sort of inevitability is required: the prospect of refusal must be certain (or nearly so)." *Id.*

"[T]he filing of one meaningful application [for administrative relief] will ordinarily be a necessary," but not necessarily sufficient, "precondition for invoking the futility exception." *Id.*

At this point the petitioners have not demonstrated that DEM rejection would be inevitable. Indeed, the town offered to assist the petitioners in obtaining DEM approval. Although DEM regulations prohibit unnecessary alterations to wetlands, the town and the petitioners still could convince DEM of the necessity of traversing the wetlands to avoid the pumping station while tying into the sewer system. *See* Rules and Regulations Governing the Administration and Enforcement of the Freshwater Wetlands Act, Department of Environmental Management, 12 Code R.I. Reg. 190–25–9.05 (2001). Thus, the petitioners have not established that the DEM application process would be an exercise in futility.

### Conclusion

Given this Court's often repeated and clearly articulated requirements, we are compelled to vacate the council's decision and remand this case to the council with instructions to make findings of fact and conclusions of law and to submit such findings and conclusions to this Court with its decision within ninety days of this opinion. This Court shall retain jurisdiction over the case while the council complies with our basic requirements. The petitioners may invoke this Court's jurisdiction within

thirty days of the council's filing of its decision.[6]

---

6. We do recognize that a town or city council improperly may attempt to take advantage of the inevitable delay that will result from an inadequate decision. If this Court were satisfied that a municipal body intentionally failed to include factual findings or legal conclusions to delay review of its decision, we would consider reversing the decision and granting the relief sought by the aggrieved party rather than remanding the case for proper development of the record. This is not such a case.