John J. CULLEN et al.

v.

TOWN COUNCIL OF the TOWN
OF LINCOLN.

No. 2001–212–M.P.

Supreme Court of Rhode Island.

March 15, 2006.

Stephen H. Burke, Esq., for Petitioners.

Anthony DeSisto, Esq., Providence, for Respondent.

Present: WILLIAMS, C.J., GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

This rather irritable bout[1] finds itself pumped back up to this Court upon a petition for further review following an initial remand in *Cullen v. Town Council of Lincoln,* 850 A.2d 900 (R.I.2004) (*Cullen*

---

1. As we noted in *Cullen v. Town Council of Lincoln,* 850 A.2d 900, 903 n. 4 (R.I.2004) (*Cullen I*), the relationship between petitioner Cullen and a certain councilman "has long ago been flushed down the drain."

*I* ), to the respondent, Town Council of the Town of Lincoln (council), for adequate findings of fact and conclusions of law. The initial writ concerned the council's denial of the application of the petitioners, John J. Cullen and Roland Montigny (petitioners), to tie into the Town of Lincoln's (town) sewer system in connection with a proposed subdivision, Whipple Cullen Farm. For the reasons set forth herein, we affirm the decision of the council.

# I

## Facts and Travel

A detailed recitation of the facts of this case can be found in *Cullen I*, 850 A.2d at 902–03. We discuss only those pertinent factual developments since our remand in *Cullen I*.

Following our instructions, on August 31, 2004, the council held further hearings on petitioners' application to tie into the town's sewer system submitted pursuant to section 19–96, article II, chapter 19 of the Town of Lincoln Code of Ordinances (sewer ordinance). The proposed sewer route at issue would empty the subdivision's effluent into the Lower River Road pumping station (pump station), which is precariously poised approximately twenty feet from the banks of the Blackstone River.

As anticipated in *Cullen I*, 850 A.2d at 905, a significant source of contention at the remand hearing was petitioners' persistent failure to apply to the Department of Environmental Management (DEM) for approval of three alternate sewer routes that would require traversing state-protected wetlands; each of these three alternate routes would be powered simply by gravity, thereby eliminating the need for a pump station connection. Richard Cohen (Cohen), the subdivision engineer, testified on behalf of petitioners that an application to DEM for permission to construct any of the three alternate routes almost certainly would be denied since the pump station route was a viable alternative that did not involve the potentially catastrophic disruption of a protected habitat. In Cohen's opinion, seeking approval from DEM in this instance would be futile. Expert Joseph P. McCue (McCue), the senior wetland biologist at Natural Resource Services, supported Cohen's assessment. The town, however, countered with the testimony of Larry Smith (Smith), the town's engineer, who maintained that it would not have been useless for petitioners to apply to DEM. Notably, the council chairman expressed frustration with petitioners' futility evidence, claiming that anything short of direct evidence from DEM of what DEM would do with regard to petitioners' applications was simply opinion, hearsay, and unhelpful.

The other issue discussed at length at the remand hearing was whether the pump station could handle the increased sewage flow that inevitably would accompany petitioners' subdivision. The council insisted that additional dwellings—coupled with the age, technological shortcomings and unfortunate location of the pump station—could only exacerbate the environmental and health fallout that would result from an accidental discharge. The petitioners attempted to rebut the council's protests with testimony that their subdivision would not increase the likelihood of a discharge. Cohen stated that the pump station would be operating only at a maximum 71 percent of its design capacity should it be called upon to serve the subdivision. In any event, Cohen insisted, the various upgrades to the pump station which petitioners had agreed to undertake would render the station safer and more fit to handle any increase in effluent flow.

Not assuaged, the town presented its own contrary evidence. Smith affirmed that, according to "Murphy's Law" and despite any upgrades to the station, any increased sewage flow would likely result in a more dire environmental and health situation in the event of a discharge. He stated that the station's approaching obsolescence was potentially problematic, its screw pump technology would require additional maintenance, and its proximity to the Blackstone River was a threat to the health, safety and welfare of the Lincoln community. Smith testified that these existing issues would only be exacerbated by the addition of petitioners' subdivision. Furthermore, Smith intimated that, without any empirical data, it was inappropriate for the council to honestly entertain petitioners' tie-in request.[2]

Upon the conclusion of testimony at the hearing, the council adopted certain findings of fact and conclusions of law in accordance with our *Cullen I* directive, and voted unanimously to deny petitioners' tie-in request. On September 13, 2004, the council submitted to this Court the following:

"1. The subject application to connect to the town sewer system is before the Town Council pursuant to Chapter 270 of the Public Laws of 1985, and Section 19–32 of the Code of the Town of Lincoln.

"2. The applicant has received Master Plan approval to subdivide the property known as the Whipple Cullen Farm.

"3. Among other things, the applicant was required to have an approved plan to tie into the town sewer system in order to obtain preliminary approval for the subdivision of the Whipple Cullen Farm.

"4. The applicant's proposal to tie into the Lower River Road Pump Station was rejected by the town's then-DPW Director.

"5. The applicant appealed that decision to the Sewer Appeal Board, pursuant to Section 19–32 of the Lincoln Town Code. The Sewer Appeals [*sic*] Board recommended that the Town Council accept the proposed tie-in, with conditions, and the applicant accepted said conditions.

"6. The Lincoln Town Council held a hearing on the matter on February 20, 2001, and denied the applicant's request to connect the Whipple Cullen Farm subdivision to the town's sewer system through the Lower River Road Pump Station.

"7. The matter is now before the Town Council on remand from the Rhode Island Supreme Court with instructions to make findings of fact and conclusions of law, to be forwarded to the Supreme Court on or before September 12, 2004.

"8. The Lower River Road Pumping Station exists but is in an undesirable location.

"9. The Lower River Road Pumping Station, and the equipment contained

---

2. For clarification, by "empirical data" we refer to either a "flow measurement test" or an "inflow/infiltration test." The parties do not dispute that neither test has been performed on the sewerage system implicated in petitioners' subdivision proposal, as the council clarified in its findings of fact. At oral argument before this Court, petitioners' counsel conceded that the council had made it clear early on in the application process that it was interested in obtaining those test results. Apparently, the tests were never conducted for financial reasons and also due to petitioners' continuing insistence that no ordinance obligates them to provide the council with these test results as a condition for permit approval.

therein, is reaching its point of obsolescence or replacement.

"10. That at this point in time, no flow test has been done or inflow/infiltration test has been done, and therefore, the Town Council has no way of knowing at this point in time either the current or future operating capacity.

"11. That the applicant, to date, has not applied to DEM to see whether or not an application would be approved.

"12. Due to the initial poor design of the pump station and the proximity of the Blackstone River to the Pump Station, any spillage would be an environmental disaster.

"13. The recommendations of the Sewer Appeals [sic] Board do not go far enough, and that at this point in time, the Town Council concludes that there should be a complete replacement of the pump station.

"14. Based upon the above, the proposed sewer connection of the Whipple Cullen Farm to the Lower River Road Pump Station would jeopardize the health, safety and welfare of the community.

\* \* \*

"The Town Council also adopted the following conclusions of law:

"1. The applicant has the burden of proving a sewer connection, as presented, would be in the best interest of the health, safety and welfare of the town.

"2. The applicant has failed to meet that burden, based upon the lack of information relative to a flow test.

"3. The Town Council cannot be certain, at this point in time, that the Lower River Road Pumping Station has the ability to handle the sewerage [sic] that may flow through there if the application were to be approved.

"4. The applicant has provided no proof that there are really no other feasible ways to connect to the sewer system."

The council's written submission repeated its oral denial of petitioners' tie-in proposal with the qualification that it was to be "without prejudice, pending further information to be supplied to the [council] regarding a flow test, an inflow/infiltration test, and determination by [DEM] regarding approval for alternative routes for a sewer connection."

On October 12, 2004, petitioners filed a petition for further review in this Court, pursuant to our retention of jurisdiction in *Cullen I*, 850 A.2d at 906–07.

## II

### Analysis

The dispositive issues presented in this case are as follows: (1) whether the council rightly placed upon petitioners the burden of proving that their proposal was in the best interests of the health, safety and welfare of the community; and (2) whether it was appropriate for the council to require petitioners to prove the nonexistence of other feasible sewerage routes. Because petitioners' several other arguments essentially rely upon our resolution of these issues, they will be discussed where appropriate.

### A

#### Standard of Review

 "When reviewing a case before this Court on a writ of certiorari, we 'scour the record to discern whether any legally competent evidence supports the lower tribunal's decision and whether the decision-maker committed any reversible errors of

law in the matter under review.' " ³ *Cullen I,* 850 A.2d at 903 (quoting *Kent County Water Authority v. State (Department of Health),* 723 A.2d 1132, 1134 (R.I.1999)). " 'If legally competent evidence exists to support that determination, we will affirm it unless one or more errors of law have so infected the validity of the proceedings as to warrant reversal.' " *Id.*

## B

### *Cullen I*

Our analysis must begin with *Cullen I.* But first, however, we feel it necessary to convey our disappointment with both petitioners and the council for ignoring the clear dictates of our opinion in that case. With respect to the council, after noting the paucity of factual findings made by its members, we cautioned the council on the imprudence of failing to reference any legal support for a denial of a tie-in application, calling this practice problematic and deficient. *Id.* at 905. Despite this admonition, upon remand the council failed yet again to refer to *any* legal authority upon which it based its denial of petitioners' tie-in application. We remind the council that it is not the role of this Court to dissect the record in search of a legal justification for its actions.

Even more unsettling, however, is the fact that petitioners never applied to DEM for approval of the three alternate sewerage routes. In *Cullen I* we stated as follows: " '[T]he filing of one meaningful application for administrative relief will ordinarily be a necessary,' but not necessarily sufficient, 'precondition for invoking the

futility exception.' " *Id.* at 906 (quoting *Gilbert v. City of Cambridge,* 932 F.2d 51, 61 (1st Cir.1991)). In the face of this clear legal command, petitioners never filed a single application with DEM, and still pursued their futility argument at the remand hearing. The petitioners' counsel admitted at oral argument before this Court that his clients' failure to apply to DEM was, in fact, calculated to force us to address an issue which, as petitioners' counsel intimated, had been artfully avoided in *Cullen I.* We are chagrined that petitioners have returned to this Court to advance the same claim having done absolutely nothing to meaningfully further their futility claim in the interim.

We move, nevertheless, to the substance of *Cullen I.* Having determined that the council provided insufficient findings of fact and citations to relevant law, our discussion in *Cullen I* proceeded from an assumption that the sewer ordinance contained no mechanism expressly authorizing the council to require proof that no alternate routes to tie into the town's sewer system were available. *See id.* at 905. We made clear that, even absent express authority, the council must retain some control over the manner in which a sewerage tie-in occurs. *Id.* We found that this was implicit in the General Assembly's grant of authority to the town council to regulate the construction of and connections to a public sewer system. *Id.*

With regard to the availability of alternate tie-in routes, we acknowledged it was unclear whether the council could premise a denial of an application solely on the

---

**3.** This matter is before this Court upon a petition for further review, following our retention of jurisdiction after remand to the Town Council of the Town of Lincoln for sufficient findings of fact and conclusions of law in *Cullen I,* 850 A.2d at 906–07. It is the practice of this Court, upon such remand

accompanied by a retention of jurisdiction, to treat a subsequent timely petition as a deferral of the initial writ. *See, e.g., Cranston Print Works Co. v. City of Cranston,* 684 A.2d 689, 692 (R.I.1996). Therefore, we treat this petition as one for a writ of certiorari.

availability of alternate routes, but we determined that the availability of an alternate means of tying into the town's sewer system would be a factor affecting the reasonableness of the council's denial. *Id.* We pause to clarify the legal significance of our *Cullen I* holding.

 "[I]t is undisputed that petitioners have a right to tie into the sewer system." *Id.* It is also true that if an applicant seeking a permit is acting under the auspices of a municipal ordinance, proof of compliance with the requirements of that ordinance, absent any pertinent zoning restrictions, "entitles [that] applicant to a permit as a matter of right." *Ecro Corp. v. Sanford,* 104 R.I. 337, 343, 244 A.2d 265, 269 (1968) (quoting *Rhode Island Refining Corp. v. Town Council of Tiverton,* 92 R.I. 88, 91–92, 166 A.2d 707, 709 (1960)). *Cullen I* made clear, however, that this cannot mean a town council can "be held hostage to petitioners' sewer system plans." *Cullen I,* 850 A.2d at 905. Quite the contrary, a town has the power "to control the manner in which an individual may tie into the sewer system." *Id.* Accordingly, *Cullen I* held that "[t]he law would justify the rejection of a proposed tie-in if [a town council] properly found that a particular plan would result in unreasonable and avoidable financial, safety and environmental concerns for the town." *Id.* In other words, the availability of alternate tie-in routes is a factor that "weigh[s] into the reasonableness of the council's rejection of an application to use a particular proposed route." *Id.*

 An applicant's modest burden of proving conformity with a municipal ordinance and the town's right to dictate the course of sewerage connections are reconcilable. Although a town must allow *a* connection for an applicant who proves satisfaction of the controlling ordinance, the town need not approve the applicant's *preferred* connection if the town council properly finds that the proposed connection "would result in unreasonable * * * financial, safety and environmental concerns for the town," *id., and* that feasible alternate routes exist. If sufficient evidence supports both these criteria then a town council's denial of a tie-in permit is reviewed simply for reasonableness.

## C

### Best Interests of the Community

The petitioners first argue that the council committed reversible error of law by placing upon them the burden of proving that their proposed tie-in would be in the best interests of the health, safety and welfare of the Lincoln community. In finding that petitioners did not satisfy this burden, the council relied upon both the location and condition of the pump station, as well as a lack of empirical data submitted by petitioners to support its denial of the proposal. The petitioners challenge the propriety of these factual bases for the council's denial as well.

 There can be no doubt that the town's ability to adopt ordinances that govern the construction and regulation of a public sewer system is both provided for by law, P.L. 1984, ch. 270, and falls squarely within the municipal police power, *see Mill Realty Associates v. Crowe,* 841 A.2d 668, 674 (R.I.2004) ("[m]aintaining a public water supply and requiring that builders construct extensions to the town's public water system falls squarely within [a municipality's] police power"); *Munroe v. Town of East Greenwich,* 733 A.2d 703, 710 (R.I.1999) ("[z]oning, land development and subdivision regulations constitute a valid exercise of [a municipality's] police power"). Proper exercise of this police power is accomplished exclusively by enacting municipal ordinances; however, a

town council has discretion to impose requirements additional to an ordinance when provided for in the ordinance itself. *See Rhode Island Refining Corp.*, 92 R.I. at 92, 166 A.2d at 709 (noting that a municipality "is vested with ample power to protect the safety of the town and its inhabitants" by enacting regulations additional to the requirements of an ordinance when that ordinance so provides).[4]

■ Unfortunately, the findings submitted to this Court by the council were "as thin as the homeopathic soup that was made by boiling the shadow of a pigeon that had starved to death"[5]; neither the council's sparse findings nor the town's brief point this Court to any ordinance or law of this state to support its imposition of this additional burden. Nevertheless, a cursory review of § 19–96 of the sewer ordinance, cited in *Cullen I*, 850 A.2d at 902, as the controlling ordinance in this matter, reveals the following language: "No connection of private property or public property with the sewer system shall be made until the owner of the land * * * has made application in writing to the director for permission to make the same, and has been granted such permission." The first subsection delineating the obligations of an applicant under that ordinance explicitly requires that "[t]he sewer permit application shall be supplemented by any plans, specifications or. other information considered pertinent in the judgment of the director." Lincoln Code of Ordinances ch. 19, art. II, § 19–96(1) (1990).

We think that this discretionary authority is dispositive here. The reservation of discretion to demand more than what the ordinance expressly requires evinces a clear intent by the town that the health, safety and welfare of the community may not be adequately protected by simple compliance with the sewer ordinance. Instead, the burden rightly has been placed upon an applicant to provide additional information reasonably necessary to allow the council to make an informed determination that the town will be protected from foreseeable health, safety or environmental dangers.[6] The council's legal conclusion

4. To support its argument that the municipal police power confers upon a town council a flexible discretionary right to demand more than what an ordinance requires, the council cites *Bionomic Church of Rhode Island v. Ruscetta*, 424 A.2d 1063 (R.I.1981). In that case this Court discussed the discretionary function of the director of public works in the city of Cranston to require certain property owners to connect to the city's sewer system. *Id.* at 1066. Because the mandatory connection ordinance at play in *Bionomic Church* is fundamentally different from the permissive ordinance in this case, *Bionomic Church* is simply irrelevant to our analysis. *See* Lincoln Code of Ordinances ch. 19, art. II, § 19–96 (1990) (requiring application to director of public works for permission to connect property with the public sewer system). We decline to hold that, absent express authorization in an ordinance, a municipal body is free to impose additional obligations upon a sewer permit applicant at whim.

5. Abraham Lincoln, Sixth Lincoln–Douglas Debate (Oct. 13, 1858), 3 *Collected Works of Abraham Lincoln* 245, 279 (Roy P. Basler ed.1953).

6. We are aware that the Lincoln sewer ordinance grants this discretionary authority upon the director of public works in the first instance. Lincoln Code of Ordinances § 19–96(1); *see also id.* § 19–22 (defining "director" as "director of public works"). However, upon appeal to and. recommendation from the sewer appeal board, the council is ultimately charged with the final determination on a tie-in application. *Id.* § 19–32. Because at this point the council is performing a nearly identical function to the director and because there is no indication in the ordinance that this discretionary power was not to be extended to the council, we perceive no reason why the council would not have the similar authority to request additional information from a tie-in applicant before rendering a final decision on an application.

that "[t]he applicant has the burden of proving a sewer connection, as presented, would be in the best interest of the health, safety and welfare of the town" is not, in our opinion, an additional legal requirement so much as it is a reiteration that, under the sewer ordinance, it was incumbent upon petitioners to supply whatever additional materials the council felt were reasonably necessary to satisfy it that petitioners' proposal was in the best interests of the community. We hold that the council's conclusion was not an error of law.

 The petitioners urge this Court to find, then, that the council's reliance upon the age, obsolescence and location of the pump station, as well as a lack of empirical data, were unreasonable bases to deny their tie-in proposal. We disagree. Unquestionably, it was petitioners' duty under the sewer ordinance to provide any additional reasonable information necessary to satisfy the council that their proposal would not pose a threat to the Lincoln community. The council has aired its concerns for the environment, for the health and safety of the town, and for the potential financial consequences of petitioners' proposal. These concerns were legitimized at the remand hearing by testimony that the pump station's age, obsolescence and dubious placement could prompt an accidental discharge inducing an environmental and health disaster that would inevitably cost the town a substantial sum for cleanup and redevelopment. Additional evidence suggested that increasing the effluent flow through the pump station—even within its design capacity—could negatively impact the amount of time the town would have to react to a pump failure, thereby increasing the likelihood of a discharge. Furthermore, the additional sewage generated by the proposed subdivision almost certainly would exacerbate the effects of any spillage.

The fact that petitioners have agreed to upgrade the pump station to include an on-site generator and telemetry equipment, while laudable, does not relieve the council's concerns entirely: While the upgrades may lessen the probability of a discharge, the council still found that the location of the pump station some twenty feet from the Blackstone River continues to represent a genuine threat to the community. The duty to replace the pump station does not rest upon the town if the pump station currently operates safely and efficiently; the town's only obligation with respect to the pump station is to ensure that it continues to operate in that manner. This requires that the council not only consider the pump station's future operation with the proposed upgrades, but also its current condition and operating capacity. If the council concludes that a proper determination is contingent upon actual knowledge of effluent flows derived from empirical testing, it is the burden of the developer—not the town—to provide the council with this additional information under the sewer ordinance. Lincoln Code of Ordinances § 19–96. Therefore, we hold that the council reasonably took into account the age, obsolescence and location of the pump station, as well as a lack of empirical data in denying petitioners' application.

## D

### Proving Alternate Routes

 The petitioners next claim that the council committed a reversible error of law by placing upon them the burden of demonstrating that no feasible alternate routes existed to achieve a sewerage connection, despite the fact that no Lincoln ordinance expressly requires such proof. We disagree.

As we indicated above, the sewer ordinance in this case accords a degree of

discretion upon the director—and thus the council following appeal from the sewer appeal board—to demand information additional to that expressly required under the sewer ordinance. Lincoln Code of Ordinances § 19–96(1). There can be no other conclusion than that the council properly exercised this discretion when it required petitioners to offer proof that they had exhausted the possibility of alternate sewerage connections.

We pause to point out, however, that even if the sewer ordinance in this case had not granted this discretion to the council, under the rubric set forth in *Cullen I*, the council still would have been justified in requiring petitioners to provide this proof. As to the first element of that inquiry, we already have set forth the council's legitimate financial, environmental, and health and safety concerns relative to petitioners' proposed sewer route. Second, petitioners' failure to apply to DEM for approval to tie into the town's sewer system using any of the three alternate gravity connections strongly suggests to this Court that alternate routes may, in fact, exist, and that application to DEM might not be futile. *See Cullen I*, 850 A.2d at 906 (quoting *Gilbert*, 932 F.2d at 61) (" '[t]he filing of one meaningful application for administrative relief will ordinarily be a necessary,' but not necessarily sufficient, 'precondition for invoking the futility exception' "); *see also Herrington v. County of Sonoma*, 834 F.2d 1488, 1495 (9th Cir.1987), *cert. denied*, 489 U.S. 1090, 109 S.Ct. 1557, 103 L.Ed.2d 860 (1989) ("a property owner cannot rely on the futility exception until at least one meaningful application has been made"); *County of Alameda v. Superior Court*, 133 Cal. App.4th 558, 34 Cal.Rptr.3d 895, 902 (2005) ("[t]he [futility] exception generally cannot be invoked unless a landowner has first made a development proposal that the authorities have rejected"); *Lost Tree Village Corp. v. City of Vero Beach*, 838 So.2d 561, 574 (Fla.Dist.Ct.App.2002) (" '[f]utility is not established until at least one meaningful application has been filed' ").

We think that this case does not warrant excepting petitioners from the ordinary requirement that they make at least one meaningful application to a state agency before seeking a remedy in the courts by pleading futility. First, the council was presented with evidence that DEM might not be so quick to deny petitioners' application.[7] In addition, petitioners' self-serving conclusion that traversing designated wetlands would present as grave a danger as their proposed pump station route is ultimately only meaningless speculation since DEM is the agency vested with the exclusive power to make precisely this determination. *See generally* G.L.1956 §§ 2–1–18 through 2–1–24. Furthermore, while DEM's regulations may require it to deny a particular tie-in route if an alternate is available which does not traverse a

---

**7.** Smith testified at the remand hearing as follows:

"Q: Based upon your experience with the [DEM], you heard the testimony that it would be futile to even apply. Do you agree with that testimony?
"A: Not in this case.
"Q: Why is that?
"A: The physical existence of the pumping station doesn't make that an alternative until the town approves it. If the town doesn't approve it, my experience with the DEM is, they're not going to say 'we're not going to entertain an application because the town denied you another way to go.' We have had applications with them in the past where things were approved based on what had been approved at the town level. And until an application is in and there's action, they may tell you to go back and see if the town will reconsider. But DEM can't tell you you have to get the town to agree to that. So I don't think it's a viable alternative if it's denied."

designated area, *see* Rules and Regulations Governing the Administration and Enforcement of the Freshwater Wetlands Act, Department of Environmental Management, 12 Code R.I. Reg. 190–25–9.05(E)(2)(b) (2001), it is unclear what DEM would do if the pump station route is no longer available due to the council's denial of petitioners' application.

The petitioners invoke *Messier v. City Council of Central Falls*, 90 R.I. 127, 155 A.2d 609 (1959), to support their claim that the council unlawfully imposed upon them an additional burden. In *Messier* this Court held that the City Council of the City of Central Falls arbitrarily and unlawfully denied permit applications when the applicant had completely satisfied all requirements under the pertinent ordinance, and when the city council relied upon factors not enumerated in the ordinance to deny the applications. *Id.* at 131, 155 A.2d at 611. Notably, we observed that none of the city council's proffered reasons concerned safety. *Id.* at 130, 155 A.2d at 610–11. It is clear from the above discussion that petitioners' reliance upon *Messier* is misplaced. We do not dispute that when an applicant satisfies all requirements in an ordinance (barring any zoning restrictions), he or she is entitled to *a* permit as a matter of right; we simply disagree that, as in the circumstances presented in this case, an applicant automatically is entitled to his or her *preferred* sewerage connection. As such, we hold that it was reasonable for the council to deny petitioners' application, especially in light of the waning capability and perilous location of the pump station.

### E

### Constitutional Claim

The petitioners finally argue that the council essentially has imposed a *de facto* moratorium on sewerage connections in the area of the proposed subdivision, effectively precluding petitioners from the beneficial use of their property in violation of their due process rights. Specifically, petitioners take issue with the council's finding that "the Town Council concludes that there should be a complete replacement of the pump station," arguing that the town's failure to replace the pump station has effectively deprived them of making a sewerage connection, and thus prevented them from the beneficial use of their property.

█ In a long line of cases beginning with *The Aldee Corp. v. Flynn*, 72 R.I. 199, 201–02, 49 A.2d 469, 470 (1946), this Court has held that "[t]he proper procedure for direct appellate review of the actions of town councils in granting or denying license applications is by a writ of certiorari to this court, except where a right of appeal is specifically provided by statute." *Phelps v. Bay Street Realty Corp.*, 425 A.2d 1236, 1239–40 (R.I.1981); *see also Eastern Scrap Services, Inc. v. Harty*, 115 R.I. 260, 262, 341 A.2d 718, 719 (1975); *Fink v. Bureau of Licenses*, 90 R.I. 408, 414, 158 A.2d 820, 823 (1960); *Order of St. Benedict v. Town Council of Portsmouth*, 84 R.I. 503, 506, 125 A.2d 150, 151 (1956). Our review upon certiorari in this instance is very narrow and is limited to whether "the town council exceed[ed] its jurisdiction or any other serious irregularity inhere[d] in its action upon a matter within its jurisdiction * * *." *The Aldee Corp.*, 72 R.I. at 201–02, 49 A.2d at 470; *see also Capaldo v. Scuncio*, 82 R.I. 240, 243, 106 A.2d 727, 728 (1954) ("Certiorari at common law brings up the record not for us to review the facts found below but for our inspection solely for errors of law.").

The constitutional argument advanced by petitioners is, at best, a collateral attack on a particular finding of the council. Without a complete factual record on this

issue we simply cannot undertake a review authorized by law. *Cf. Pollard v. Acer Group,* 870 A.2d 429, 432 & n. 10 (2005) (noting that a due process attack on a statute was not properly before this Court as it was not raised below and could not be heard under our narrow constitutional exception to the "raise or waive" rule).

### Conclusion

The discretionary power accorded the council under the sewer ordinance and the petitioners' failure to meaningfully pursue alternate routes compel this Court to affirm the decision of the council. We again caution the council that any denial of a sewerage tie-in application must be accompanied by thorough findings of fact and citations to the controlling ordinance, or any other applicable law. Furthermore, since the application was denied "without prejudice," there is no obstacle to the petitioners' resubmitting their tie-in proposal.

For the foregoing reasons we deny the petition for writ of certiorari, quash the writ as improvidently issued, and return the records in this case to the town with our decision endorsed thereon.