DECISION
Before this Court is an appeal from a decision of the Zoning Board of Review for the Town of East Greenwich (the Board) brought by Appellants Sovran Acquisition Limited Partnership (Sovran) and Uncle Bob's Self Storage (Uncle Bob's) (collectively, the Appellants). As grounds for their appeal, the Appellants assert that the Board erroneously denied their application for a special-use permit despite the overwhelming evidence in favor of the application, and that the decision should be vacated as "fatally infirm" because the Board failed to make any findings of fact or conclusions of law.[1]
Jurisdiction is pursuant to G.L. 1956 § 45-24-69.
 Facts and Travel
Sovran is the owner of a 4.92 acre tract of land located at 2771 South County Trail (Route 2) in the Town of East Greenwich, and described as Lot No. 93 on Tax Assessor's Plat No. 18-C.See Planning Board Report at 1. The property is a split-zoned lot, with the front two hundred feet located in a zoned Commercial Highway District (CH). See id. at 2. The portion located to the rear of the property is zoned Light Industry and Office (M/LIO), and contains five self-storage facilities. Seeid. The front portion of the lot currently is undeveloped and is the subject of this appeal. See Aerial Photograph. The property has approximately 302 feet of frontage on Route 2, and is surrounded by Camp Fogarty on two sides. Planning BoardReport at 1-2. A "dance/workout facility" is located on the third side. Hearing Transcript dated January 25, 2005 at 6 (Tr. I).[2]
On July 14, 2000, the Appellants submitted an application for a use variance in order to construct two new storage buildings on the CH portion of the property. See Uncle Bob's Self Storagev. Wilkins, WL 393696, at *2 (R.I.Super.Ct. Feb. 14, 2002). At the time, storage facilities were prohibited uses in both CH and M/LIO zones; thus, the existing storage facilities on the M/LIO portion of the property constituted a nonconforming use. Seeid. While the application was pending, the Town Council for the Town of East Greenwich (Town Council) amended the Zoning Ordinance for the Town of East Greenwich (Ordinance) to permit storage facilities in M/LIO zones, and to allow owners to expand nonconforming uses by way of a special-use permit. See id.
At the hearing on use-variance application, the Board allowed the Appellants to amend their application to a request for a special-use permit. See id. The Planning Board for the Town of East Greenwich (Planning Board) unanimously voted to recommend approval of the application. Tr. I at 5. At the conclusion of the hearing, the Board denied the application by a vote of four to one.[3] The Appellants timely appealed that decision to the Superior Court. See Uncle Bob's Self Storage, WL 393696, at *3. The Court affirmed the Board's decision, concluding that the construction of a storage facility in a CH zone was not a permitted use; consequently, "the Appellants should have pursued an application for a use variance, not a special-use permit."See id. at *8-10.
The Appellants then petitioned the Town Council to amend the Ordinance. Tr. I at 4. Thereafter, the Town Council amended the Ordinance to allow the construction of self-storage facilities by way of a special-use permit on lots located in zones split between M/LIO and CH districts, and where self-storage facilities already exist on the property. Id.[4] Subsequently, the Appellants filed a new application for a special-use permit to construct two self-storage facilities on the CH portion of the property. See Application.
The Planning Board reviewed the application and made the following recommendation:
 "[T]he proposed building plans showing the gable-roofed alternative are most compatible with the Comprehensive Plan's recommendations. The enhanced vegetation is welcomed but, as noted, when the new construction is compatible and appropriate, screening becomes less important. Should the Board decide to approve the special use permit, they should do so with the conditions that the clapboard sided structure with gable roof be built and that it be confined to a single story."
At a duly noticed hearing, numerous witnesses testified on behalf of the Appellants: Registered Professional Engineers John Caito (Caito) and Jeffrey Hanson (Hanson); Registered Architect David Winsor (Winsor); General Contractor Richard DelFino (DelFino); Licensed Landscape Architect George Gifford (Gifford); Professional Planner Charles H. Vernon (Vernon); and S. Peter White (White) of White Appraisal Company.
Registered Professional Engineer Caito was the first witness to testify. Tr. I at 5. He presented plans that he had prepared for the project, as well as some aerial photographs of the site.Id. at 6. He described the existing facilities as "one story [metal] structures, typical of a self-storage facility, with overhead [metal] doors." Id. at 6-7. He testified that the leaching field would be relocated, but that the "driveway ingress and egress point [would] remain the same" and there would be a control gate. Id. at 7 and 12. Caito further testified that there would be no need for any type of fencing in the front of the property because the front of one of the new buildings, combined with the control gate, would provide security for the property. Id. at 8.
Caito stated that the proposed structures each would be two-stories high, and that they would be climate-controlled.Id. at 9. The moisture and humidity control would provide "the proper environment for storage of high-quality medical goods, antiques, paintings, whatever." Id. He later opined that because this type of facility historically has a very low impact on traffic, he did not think there would be any problems in obtaining a Physical Alteration Permit. Id. at 14. The hearing later was continued so that the Board could review materials submitted by the Appellants. Id. at 20-21.
On March 22, 2005, Counsel for the Appellants informed the Board that
 "the first building will be located 65 feet back from the South County Trail. Now, your zoning code allows 50 feet back. We're proposing that we build it 65 feet back. The second facility, second building, will be located behind that. Neither of these facilities would have doors that would show from South County Trail. In fact, one of the purposes of these buildings will be to block the look of the five buildings that presently exist on the site and which have doors that you can see from South County Trail. The hours of operation would be the same as they presently are. There will be no increase in employees or manning the gate or the gate house to get into the facility." Tr. III at 7.
He further informed the Board that since the last meeting, the Appellants had revised their plans from a "block, flat roofed building located . . . 50 feet off South County Trail" to a "gabled roofed facility that looks very much like an office building." Id. at 8.
Registered Professional Engineer Hanson then took the stand.Id. at 9. He testified that his firm tested the existing storm water facility and found it to be "adequate to accept the additional run off from the two [new] buildings and the additional parking area." Id. at 11. He agreed that the significance of this finding is that there would be "zero net run off to the street." Id. Hanson then testified that because the purpose of the proposal is to provide storage rather than office facilities there would "be no significant increase or adverse impact to traffic." Id. at 12.
Registered Architect Winsor offered a diagram depicting four different expansion scenarios for comparison purposes. Id. at 13. He testified that at the top of the diagram was an architectural rendering of three story, thirty-five foot high office building.[5] Id. The remaining three buildings depicted in the diagram consisted of three self-storage units.Id. The first was the original proposal with the "upper half of the building being clad in a composite or synthetic stone panel system, and the lower half is clad in a split-faced masonry."Id. at 13-14. The proposed first and second self-storage facilities both would be approximately nineteen feet four inches in height. Id. at 14.
Winsor then testified about the second and third self-storage proposals:
 "One is what I call a retro-industrial look, which is intended to look like a restored industrial building, which is pretty common in that area, with a brick face and blocked-off windows . . . Finally we have the last option for self storage, which is depicted as a colonial building. . . . The colonial building is about 29 feet high to the ridge of the gable roof, and that is to help with the screening of the structures behind." Id.
Both of the latter options would have two levels, but they had been designed in such a way as to disguise that fact. Id. at 15. When asked whether they could use more attractive material than metal when constructing the gabled roof, Hanson that he was "sure that there's [sic] all kinds of room for compromise in the exact materials. . . ." Id. at 18.
Next to testify was General Contractor DelFino. Id. at 19. He testified that option four, the gable-type building, "would be clapboard. . . . And the windows would be — they wouldn't be functional windows, but they would look like functional windows from the outside." Id. at 21. DelFino told the Board that the colonial structure, the roof, and the "cementitious clapboard" would be noncombustible, but that the clapboard would appear identical to wood from the street. Id. at 21-22. He observed that option four would be the most expensive to construct. Id.
at 22.
Licensed Landscape Architect Gifford then testified. Id. at 23. He testified that he had been retained to prepare a landscape plan that would improve the curb appeal of the property. Id. He further testified that because access to the buildings would be from the rear, the proposal avoids the need for any paving in the front of the property. Id. at 24. As a result "100 percent of this 65-foot deep [setback] zone is all green landscaping." Id.
Furthermore, due to the configuration of the proposed buildings, the existing chain link fence no longer would be necessary to provide security. Id. at 24-25. He then testified that "right away, before we come to the plantings, those two elements [no paving and no fence] are substantial elements to the basis of the landscape design." Id. at 25. Gifford stated that the plan was to plant shade trees along the street and a mixture of three different types of lower shrubbery along the base of the building, as well as evergreen clusters along the central and north side of the property. Id.
Thereafter, Professional Planner Vernon testified. Id. at 26. Vernon testified about a Fiscal Impact Study that he had conducted on the proposal in order to assess whether it was consistent with the Comprehensive Plan. See Fiscal ImpactStudy. Using the value approach, he concluded that were the Appellants to build the largest office development feasible, the Town would receive $22,970 per year in tax revenue. Id. at 29. The self-storage proposal would yield annual tax revenues of $22,925. Id. Thus, "the difference in the net tax revenue to the town, between the office space and Uncle Bob's is negligible." Id. at 30. Vernon then testified that "[t]he market is not responding to a small site like this for an office building." Id. at 30. He further stated that substantial tax incentives in West Warwick provide office developers greater opportunities than are available in East Greenwich; [t]herefore, they can offer space . . . at much less rent than is being offered in East Greenwich." Id. at 31.[6]
Vernon then testified that Comprehensive Plan
 "talks about providing amenities for the office development . . . And amenities, such as, what Uncle Bob's is going to provide, cheaper storage space for offices in office parks for records, for archived information, things of that sort . . . if you were an owner or [sic] an office space, you'd be paying $20 to $25 a square foot to store that space or you're going to be paying $100 to $150 per unit to store that material." Id. at 32-33.
He then opined that because traffic will not be an issue, and considering that it will increase the Town's tax base with relatively little impact, the proposal is "absolutely in compliance with the Comprehensive Plan, albeit not an office, but an amenity to that kind of development . . . And, the proposed development will not result in or create conditions that will [be] inimical to the public health, safety, morals and general welfare of the community." Id. at 33-34.
The final witness to testify was Appraiser White. Id. at 47. He testified that
 "[i]n my opinion, the effect of [sic] the surrounding neighborhood will be completely neutral, in terms of value . . . it's a mixed use area. There are many diverse types of business and offices in the surrounding area, and I would think that a storage building of this nature, which is esthetically pleasing, would certainly blend in with the neighborhood." Id. at 47-48.
At the conclusion of White's testimony, Counsel for the Appellants rested. Id. at 48. As there were no objectors, Counsel for the Appellants then gave his closing argument. Id.
Thereafter, a Board member made a motion to approve the application with certain conditions. The motion failed by a vote of three to two.[7] On June 17, 2005, the Board issued a written Decision. The Appellants timely appealed.
 Standard of Review
The Superior Court's review of a zoning board decision is governed by § 45-24-69(d). Section § 45-24-69(d) provides:
 "The court shall not substitute its judgment for that of the zoning board of review as to the weight of the evidence on questions of fact. The court may affirm the decision of the board of review or remand the case for further proceedings, or may reverse or modify the decision if substantial rights of the appellant have been prejudiced because of findings, inferences, conclusions or decisions which are:
 (1) In violation of constitutional, statutory, ordinance or planning board regulations provisions;
 (2) In excess of the authority granted to the zoning board of review by statute or ordinance;
 (3) Made upon unlawful procedure;
 (4) Affected by other error of law;
 (5) Clearly erroneous in view of the reliable, probative, and substantial evidence of the whole record; or
 (6) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion."
It is axiomatic that "[t]he Superior Court reviews the decisions of a plan commission or board of review under the `traditional judicial review' standard applicable to administrative agency actions." Restivo v. Lynch, 707 A.2d 663,665 (R.I. 1998). When reviewing a zoning board decision, the Superior Court "lacks [the] authority to weigh the evidence, to pass upon the credibility of witnesses, or to substitute [its] findings of fact for those made at the administrative level."Id. at 665-66 (quoting Lett v. Caromile, 510 A.2d 958, 960
(R.I. 1986)). The trial justice "must examine the entire record to determine whether `substantial' evidence exists to support the board's findings." DeStefano v. Zoning Bd. of Review ofWarwick, 122 R.I. 241, 245, 405 A.2d 1167, 1170 (1979).
Furthermore, it is well settled that "a municipal board, when acting in a quasi-judicial capacity, must set forth in its decision findings of fact and reasons for the actions taken."Kaveny v. Town of Cumberland Zoning Bd. of Review, 875 A.2d 1,8 (R.I. 2005) (quoting Sciacca v. Caruso, 769 A.2d 578, 585
(R.I. 2001)); see also Article XIV, Section 4.1 of the Ordinance ("The board shall include in its decision all findings of fact and conditions. . . .") These requirements are necessary for the purposes of "facilitating judicial review, avoiding judicial usurpation of administrative functions, assuring more careful administrative consideration, helping parties plan their cases for rehearings and judicial review, and keeping agencies within their jurisdiction." Cullen v. Town Council of Town ofLincoln, 850 A.2d 900, 904 (R.I. 2004) (quoting Hooper v.Goldstein, 104 R.I. 32, 44, 241 A.2d 809, 815 (1968)).
Accordingly, "[t]he absence of such findings and conclusionsprecludes judicial review of a [board's] decision." Cullen,850 A.2d at 904 (emphasis added.) In situations where a zoning board "fails to disclose the basic findings upon which its ultimate findings are premised, [this Court] will neither search the record for supporting evidence nor will [it] decide for [itself] what is proper in the circumstances." Id. (quotingHooper, 104 R.I. at 44, 241 A.2d at 815).
 The Board's Decision
The Appellants contend that the Board's Decision was clearly erroneous in light of all the reliable, probative and substantial evidence in the record, and they maintain that the evidence fully satisfied all of the requirements for a special-use permit. The Appellants further assert that the Decision is "fatally infirm" because the Board failed to make mandatory findings of fact and conclusions of law.
In response, the Board filed a Motion to Remand so that it could make the statutorily required findings. The Appellants objected and also filed a Motion for Decision. A Superior Court Justice denied the Motion to Remand on June 30, 2006. On July 6, 2006, the Justice granted the Appellants' Motion for Decision "on the record as presently constituted. . . ." The Court further ordered the Board to "file a brief in support of its position and if no brief is filed a decision will be rendered thereafter." Subsequently, the Board filed a brief in which it essentially repeated its request for a remand. This Court will now address the merits of the appeal.
The Ordinance defines a special use as "[a] regulated use which is permitted pursuant to the approval of a Special-Use Permit issued by the Zoning Board of Review. Formerly referred to as a special exception. Article II of the Ordinance. The standards for granting a special-use permit are set forth in Article XIV Section 8.4 of the Ordinance. It provides:
 "8.4 In reviewing an application for a special use permit, the board shall require that evidence satisfying standards in this section be entered into the record of the proceedings. Such evidence shall satisfy the following standards:
 8.4.1 That the public convenience and welfare will be substantially served.
 8.4.2 That the proposed development will be in harmony with the general purpose and intent of this ordinance and the comprehensive plan.
 8.4.3 That the proposed development will not result in or create conditions that will be inimical to the public health, safety, morals and general welfare of the community.
 8.4.4 That the granting of the special use permit will not substantially or permanently injure the appropriate use of the property in the surrounding area or district." Article XIV Section 8.4 of the Ordinance.
An applicant for a special-use permit must establish as a condition precedent that the relief sought is "reasonably necessary for the convenience and welfare of the public." Tooheyv. Kilday, 415 A.2d 732, 737 (R.I. 1980). To satisfy this mandatory standard, the applicant only must show that "`neither the proposed use nor its location on the site would have a detrimental effect upon public health, safety, welfare and morals.'" Id. (quoting Hester v. Timothy, 108 R.I. 376,385-86, 275 A.2d 403, 406 (1971)). In considering public health, this Court "should exercise restraint in substituting its judgment for the judgment of the zoning board which is based on the evidence before it." Hein v. Town of Foster Zoning Bd. ofReview, 632 A.2d 643, 646 (R.I. 1993) (quoting Mendonsa v.Corey, 495 A.2d 257, 263 (R.I. 1985)). However, the way in which land is used "must be congruous with, tolerant of and have no adverse effects upon existing neighborhood uses." Hein,632 A.2d at 646 (quoting Hendels Investors of Rhode Island, Inc. v.Zoning Board of Westerly, 100 R.I. 264, 265, 214 A.2d 200, 202
(1965)).
When the Appellants submitted their application, the Ordinance authorized the Board to grant a special-use permit to allow the construction of storage facilities on split-zone lots with existing storage facilities. In its Decision, the Board recited much the evidence presented to it at the hearing. It then observed that there was a motion to approve the application on condition: "1. That the applicant construct the Colonial style buildings as presented; 2. That the East Greenwich Department of Public Works review and approve the drainage plans and ventilation; [and,] 3. That all the vegetation be installed pursuant to the plan presented by George Gifford." Decision at 3. Thereafter, the Board simply stated that "[i]n a (3-2) vote in favor of the motion, with Mr. Russolino and Mr. Zenga opposing, the application was denied."
The Board failed to make a single finding of fact or conclusion of law in support of its Decision. Although, there appears to be an abundance of evidence in support of the application, in view of the complete absence of findings and conclusions, this Court should avoid judicial usurpation of the Board's administrative functions by searching the record for supporting evidence or decide what is proper under the circumstances. As this Court is precluded from determining the basis for the Board's denial of the special-use permit, it is unable to address the merits of the application and must remand the matter to the Board for a full decision.
 Conclusion
After a review of the entire record, this Court finds that the Board's decision was in violation of statutory and constitutional provisions, and made upon unlawful procedure. The record is remanded to the Board for the requisite findings and conclusions. This Court will retain jurisdiction over the matter.
Counsel shall submit an appropriate order consistent with this opinion.
[1] See Appellants' Brief at 22.
[2] The hearing was conducted on January 25, 2005; February 22, 2005; and March 22, 2005. The transcripts from those proceedings will be referred to as Tr. I, Tr. II, and Tr. III,
respectively.
[3] The Superior Court Justice summarized the Board's findings:
 "(1) the proposed buildings would be too close to Route 2; (2) the proposed buildings were inconsistent with the recent `high end office development' in the area, (3) the proposed vegetative buffers were inadequate to prevent diminishing property values in the surrounding areas; and (4) the application failed to satisfy all the criteria for the grant of a special-use permit; namely the Appellants did not prove that the application was in harmony with the Comprehensive Plan and surrounding uses." Uncle Bob's Self Storage v. Wilkins, WL 393696, at *3 (R.I.Super.Ct. Feb. 14, 2002).
[4] According to Counsel for the Appellants, "[t]his is the only [property] with a split zone that had self storage facilities already existing. This is it. There's no other place in Town. So, somebody can't march in, three weeks from now, and say, I'm going to do the same thing. It doesn't exist." Tr III
at 45.
[5] The height restriction in a CH District is thirty-five feet. See Article III, § 3.5 of the Ordinance, entitled Table of Dimensional Requirements for Permitted Uses.
[6] The Board's Chairman dismissed the financial consequences as "immaterial," stating that "to make a comparison and analogy of West Warwick with this community, let me tell you, sir, the prices are higher, but this is a premiere community, and to look at the financial status of West Warwick, I think is inappropriate. . . ." He further stated that "this community is a great community, probably the finest community in Rhode Island, and for that very reason, we are trying to protect Route 2 from not developing Warwick into our community, and we have to be very careful about the development on that." Tr. III at 36.
[7] Section 45-24-57(2)(iii) of the Rhode Island General laws provides:
 "The concurring vote of four (4) of the five (5) members of the zoning board of review sitting at a hearing are required to decide in favor of an applicant on any matter within the discretion of the board upon which it is required to pass under the ordinance, including variances and special-use permits."