Margaret PASTORE, in her capacity
as Administratrix of the Estate
of Fred V. Pastore

v.

Charles SAMSON, M.D. et al.

No. 2005–110–MP.

Supreme Court of Rhode Island.

June 16, 2006.

Michael T. Eskey, Esq., Providence, for Plaintiff.

Michael G. Sarli, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

On this writ of certiorari, Kent County Memorial Hospital (hospital) requests that we review a decision of a motion justice granting the motion of the plaintiff, Margaret Pastore (plaintiff), administratrix of the estate of Fred V. Pastore (Pastore), whereby the hospital would be required to produce in the course of discovery in this medical malpractice civil suit some 750 pages of documents pertaining to one of its doctors. The hospital's primary contention is that the production of these documents would offend the "peer-review" privilege afforded by G.L.1956 § 23–17–25 and G.L.1956 § 5–37.3–7. For the following reasons, we affirm in part and reverse in part.

I

## Facts and Travel

The genesis of this medical malpractice action was the death of Pastore on July 12, 1998. According to plaintiff's complaint, Charles Samson, M.D. (Dr. Samson) and Richard San Antonio, M.D. (Dr. San Antonio) provided negligent care to Pastore earlier that day at the hospital, and such treatment caused his death. As his mother and the administratrix of Pastore's estate, plaintiff brought suit against defendants, Dr. Samson, Dr. San Antonio, and the hospital (collectively defendants) in the Superior Court. In addition to a variety of other negligence-based counts, plaintiff also alleged that the hospital negligently credentialed and granted hospital privileges to Dr. Samson.

The discovery phase stalled as plaintiff and the hospital engaged in a lengthy battle over certain hospital documents concerning Dr. Samson. This discovery mêlée began when plaintiff served her third request for production on the hospital pursuant to Rule 34 of the Superior Court Rules of Civil Procedure. That request sought the following: (1) information related to the credentialing or privileges of Dr. Samson or Dr. San Antonio; (2) documents sent to Dr. Samson or Dr. San Antonio by any committee investigating or reviewing his request for, or renewal of, privileges; (3) all items setting forth any limitation upon the privileges or credentials of Dr. Samson or Dr. San Antonio.[1]

---

1. That request reads in its entirety:

"Pursuant to Rule 34 of the Superior Court Rules of Civil Procedure, Plaintiff requests the Defendant, Kent County Hospital, produce for copying and/or inspection, at 36 Exchange Terrace, Providence, RI within forty (40) days, true and complete copy [sic] of the materials listed below, or originals if so designated and pertaining to radiographic films.

"1. All information received in the course of reviewing the credentials and/or privileges of Charles Samson, M.D., from the time Dr. Samson first requested privileges to date, including but not limited to all applications for privileges, all communications received from the Rhode Island Board of Medical Licensure and Discipline and all letters from Dr. Samson and/or others.

"2. Any and all documents of any kind sent to Dr. Samson by any committee or board investigating and/or reviewing his request for privileges and/or renewal of privileges, from the time Dr. Samson first requested privileges to date.

"3. All documents, paper or digital, that set forth any limitation upon the privileges and/or credentials of Charles Samson, M.D., including but not limited to:
a. Disciplinary action;
b. Administrative action;
c. Voluntary action;
d. Limit to privileges[;]
e. Suspension of privileges;
f. Revocation of privileges;
g. Revocation of appointment;
h. Resumption of privileges[;]
i. Leave of absence without privileges;
j. Resignation of privileges;
k. Requirement of supervision[.]

"4. All information received in the course of reviewing the credentials and/or privileges of Richard San Antonio, M.D., from the time Dr. San Antonio first requested privileges to date, including but not limited to all applications for privileges, all communications received from the Rhode Island Board of Medical Licensure and Discipline and all letters from Dr. Samson [sic] and/or others.

"5. Any and all documents of any kind sent to Dr. San Antonio by any committee or board investigating and/or reviewing his request for privileges and/or renewal of privileges, from the time Dr. San Antonio first requested privileges to date.

"6. All documents, paper or digital, that set forth any limitation upon the privileges and/or credentials of Richard San Antonio, M.D., including but not limited to:
i. Disciplinary action;
ii. Administrative action;
iii. Voluntary action;
iv. Limit to privileges[;]
v. Suspension of privileges;
vi. Revocation of privileges;
vii. Revocation of appointment;

After the hospital objected on the grounds of peer-review privilege and after plaintiff moved to strike those objections and compel the hospital to produce the documents, a motion justice conditionally sustained the hospital's objection, giving it thirty days to compile a privilege log.

After the parties wrangled over how to protect the confidential nature of some of the documents,[2] the hospital produced certain documents, as well as a privilege log for those that were not produced. Roughly two and a half years later, plaintiff moved to compel a further response, arguing that the peer-review privilege did not protect the withheld documents; the hospital eventually responded by producing some additional documents, and then supplementing the privilege log. The plaintiff then filed a renewed motion to compel a further response, requesting that the motion justice conduct an *in camera* review to determine whether the documents referred to in the supplemental privilege log actually were protected by the peer-review privilege. The hospital objected, arguing that the documents were protected by both the peer-review privilege and the Confidentiality of Health Care Information Act, G.L.1956 chapter 37.3 of title 5.

Based on a request that a second motion justice made at a chambers conference, the hospital submitted a second supplemental privilege log itemizing some

750 pages of documents and now asserting four categories of privileges: peer-review, confidential health-care information, board of medical licensure and discipline, and attorney-client.[3] The motion justice then heard arguments from the parties concerning the privileges, as well as the hospital's additional motion to sever the negligent credentialing claim from the remaining malpractice claims. After hearing those arguments, the motion justice denied without prejudice the hospital's motion to sever; she also granted plaintiff's motion to compel the production of the documents on the condition that she would review the documents *in camera* and sort them into four types: documents that clearly were privileged; documents that clearly were unprivileged; documents of a questionable nature that the hospital needed to clarify; and those that contained an individual's confidential information.

After conducting that *in camera* review, the motion justice ordered the hospital to produce all 750 pages of the documents to plaintiff. The only limit on the disclosure was that certain documents were to be redacted to omit patient information, such as names and Social Security numbers. Although she prefaced her ruling with the concern that a negligent credentialing claim was irreconcilable with the peer-re-

viii. Resumption of privileges[;]
ix. Leave of absence without privileges;
x. Resignation of privileges;
xi. Requirement of supervision."

2. The hospital moved for a protective order, which was granted. Issued pursuant to Rule 26(c) of the Superior Court Rules of Civil Procedure, the protective order applied to all documents produced by the hospital in the course of discovery and it prohibited the parties from "disseminating said documentation to any persons or entities other than the parties, the parties' attorneys, or experts retained by the parties."

3. During the course of discovery, the parties appeared before several different Superior Court justices. Not all those appearances are relevant to this petition, and, therefore, some of them are not referred to in our recitation of the facts. For the sake of clarity, the petition for writ of certiorari was granted to review the decision of a second motion justice, specifically her order requiring the hospital to disclose the 750 pages of documents delineated in the hospital's second supplemental privilege log.

view privilege, she also reiterated that she did not consider information that was not "generated in the peer review process," such as a patient complaint, to be protected by that privilege. The only document that the motion justice referred to expressly in her ruling was a transcript—numbered 492–543 in the hospital's second supplemental privilege log—that she determined was not privileged because it only related to quality control "in the broadest sense of the term[ ]." Finally, the motion justice stayed the order for five days to allow for a petition to this Court for writ of certiorari.

A duty justice of this Court granted the hospital's initial motion for stay *pendente lite*. We then granted defendants' petition and continued the stay until further order of this Court.

## II

### Analysis

For simplicity, we will subdivide the arguments set forth by the hospital and Dr. Samson into arguments pertaining to the peer-review privilege and arguments pertaining to other privileges.[4]

The central focus of the arguments set forth by both the hospital and Dr. Samson is on the peer-review privilege. The hospital posits three basic arguments with respect to that privilege. First, the hospital argues that our previous decisions concerning the peer-review privilege must be "revisited." In a similar vein, the hospital also requests that we conclude, contrary to a previous decision, that the peer-review privilege statute is a remedial statute that should be construed liberally. Second, assuming *arguendo* that the motion justice's legal interpretation of the peer-review privilege was correct, the hospital contends

that the motion justice nevertheless erred in her application of the privilege when she ordered the production of all the documents because at least one of the documents was generated by a peer-review board and at least one other document was a transcript of a hearing of a peer-review board. Third, the hospital urges us to interpret the peer-review privilege statute to require a plaintiff to obtain information from its original source; Dr. Samson joins the hospital in this third argument.

Doctor Samson makes two additional arguments. First, Dr. Samson contends that the peer-review privilege can be interpreted consistently with the recognition of a cause of action for negligent credentialing. Second, he advocates in favor of severing the negligent credentialing claim from the rest of the claims.

Turning to arguments pertaining to other privileges, the hospital contends that the motion justice erred in ordering the production of documents protected by the attorney-client privilege, the Confidentiality of Health Care Information Act, and the confidential records of the board of medical licensure and discipline.

 As we address these arguments, we remain cognizant of the applicable standards of review. Because we review this case on a writ of certiorari, we must " 'scour the record to discern whether any legally competent evidence supports the lower tribunal's decision and whether the decision[-]maker committed any reversible errors of law in the matter under review.' " *Cullen v. Town Council of Lincoln*, 850 A.2d 900, 903 (R.I.2004). " 'If legally competent evidence exists to support that determination, we will affirm it unless one or more errors of law have so infected the validity of the proceedings as to warrant

---

**4.** We take this opportunity to thank Rhode Island Hospital and The Medical Malpractice Joint Underwriting Association of Rhode Island for their amicus briefs.

reversal.' " *Id.* We similarly are deferential when reviewing a lower court's factual determinations on discovery issues: We will not disturb such a determination unless a motion justice abuses his or her discretion. *See Corvese v. Medco Containment Services, Inc.,* 687 A.2d 880, 881–82 (R.I.1997).

## A

### Peer–Review Privilege

Before reaching this issue, we must set forth the current state of the law on the peer-review privilege in this jurisdiction. Rule 26(b)(1) of the Superior Court Rules of Civil Procedure provides the outer bound of the scope of discovery: "Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action * * *."

Etymologically, the word "privilege" is derived from a combination of two Latin words meaning "private law." *Jaffee v. Redmond,* 518 U.S. 1, 32 n. 4, 116 S.Ct. 1923, 135 L.Ed.2d 337 (1996) (Scalia, J., dissenting). Some of the more common privileges are between "attorney and client, husband and wife, priest and penitent." Robert B. Kent et al., *Rhode Island Civil Procedure* § 26:7, V–21 (West

2006). A determination of the proper scope of a privilege demands a delicate balancing: "The privileges * * * are designed to protect weighty and legitimate competing interests. * * * [T]hese exceptions to the demand for every man's evidence are not lightly created nor expansively construed, for they are in derogation of the search for truth." *United States v. Nixon,* 418 U.S. 683, 709, 710, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).[5] Nevertheless, certain privileges are recognized because they are deemed to serve such a vitally important public good that " 'transcend[s] the normally predominant principle of utilizing all rational means for ascertaining truth.' " *Trammel v. United States,* 445 U.S. 40, 50, 100 S.Ct. 906, 63 L.Ed.2d 186 (1980). In the specific context of the peer-review privilege, we have acknowledged the social importance of "open discussions and candid self-analysis in peer-review meetings to ensure that medical care of high quality will be available to the public." *Moretti v. Lowe,* 592 A.2d 855, 857 (R.I.1991).

Two similar yet distinct Rhode Island statutes afford providers of health care the peer-review privilege. Section 23–17–25(a)[6] and § 5–37.3–7(c)[7] create a privi-

---

**5.** We have stated in a similar vein that privileges generally

" 'do not in any wise aid the ascertainment of truth, but rather they shut out the light[, and their] sole warrant is the protection of interests and relationships which, rightly or wrongly, are regarded as of sufficient social importance to justify some incidental sacrifice of sources of facts needed in the administration of justice.' " *State v. Almonte,* 644 A.2d 295, 298 (R.I.1994).

We are also mindful that "[t]ruth, like all other good things, may be loved unwisely—may be pursued too keenly—may cost too much." *In re Philip S.,* 881 A.2d 931, 934 (R.I.2005) (quoting *Pearse v. Pearse,* 1 DeG. & Sm. 12, 28–29, 63 Eng. Rep. 950, 957 (Ch. 1846)).

**6.** General Laws 1956 § 23–17–25(a) provides:

"Neither the proceedings nor the records of peer review boards as defined in § 5–37–1 shall be subject to discovery or be admissible in evidence in any case save litigation arising out of the imposition of sanctions upon a physician. However, any imposition or notice of a restriction of privileges or a requirement of supervision imposed on a physician for unprofessional conduct as defined in § 5–37–5.1 shall be subject to discovery and be admissible in any proceeding against the physician for performing, or against any health care facility or health care provider which allows the physician to perform the medical procedures which are the subject of the restriction or supervision during the period of the restriction or su-

lege for the "proceedings" and "records" of peer-review boards, such that those documents shall not be subject to discovery or be admissible in evidence.[8] Section 5-37.3-7(c) further refines what is protected:

"No person who was in attendance at a meeting of [a peer-review] board shall be permitted or required to testify as to any matters presented during the pro-

pervision or subsequent to that period. Nothing contained in this section shall apply to records made in the regular course of business by a hospital or other provider of health care information. Documents or records otherwise available from original sources are not to be construed as immune from discovery or used in any civil proceedings merely because they were presented during the proceedings of the committee."

7. General Laws 1956 § 5-37.3-7(c) provides:
"Except as provided in this section, the proceedings and records of medical peer review boards shall not be subject to discovery or introduction into evidence. No person who was in attendance at a meeting of that board shall be permitted or required to testify as to any matters presented during the proceedings of that board or as to any findings, recommendations, evaluations, opinions, or other actions of that board or any members of the board. Confidential health care information discoverable or admissible from original sources shall not be construed as immune from discovery or use in any proceeding merely because that information was presented during proceedings before that board, nor is a member of that board or other person appearing before it to be prevented from testifying as to matters within his or her knowledge and in accordance with the other provisions of this chapter, but that witness cannot be questioned about his or her testimony or other proceedings before that medical peer review board or about opinions formed by him or her as a result of those proceedings."

8. General Laws 1956 § 5-37-1(11)(i) defines a peer-review board as:
"any committee of a state or local professional association or society including a hospital association, or a committee of any licensed health care facility, or the medical

ceedings of that board or as to any findings, recommendations, evaluations, opinions, or other actions of that board or any members of the board. * * * [A] witness cannot be questioned about his or her testimony or other proceedings before that medical peer review board or about opinions formed by him or her as a result of those proceedings."

staff thereof, or any committee of a medical care foundation or health maintenance organization, or any committee of a professional service corporation or nonprofit corporation employing twenty (20) or more practicing professionals, organized for the purpose of furnishing medical service, or any staff committee or consultant of a hospital service or medical service corporation, the function of which, or one of the functions of which is to evaluate and improve the quality of health care rendered by providers of health care service or to determine that health care services rendered were professionally indicated or were performed in compliance with the applicable standard of care or that the cost of health care rendered was considered reasonable by the providers of professional health care services in the area and shall include a committee functioning as a utilization review committee under the provisions of 42 U.S.C. § 1395 et seq. (Medicare law) or as a professional standards review organization or statewide professional standards review council under the provisions of 42 U.S.C. § 1301 et seq. (professional standards review organizations) or a similar committee or a committee of similar purpose, to evaluate or review the diagnosis or treatment of the performance or rendition of medical or hospital services which are performed under public medical programs of either state or federal design."

Section 5-37-1(11)(ii) also defines it as:
"the board of trustees or board of directors of a state or local professional association or society, a licensed health care facility, a medical care foundation, a health maintenance organization, and a hospital service or medical service corporation only when such board of trustees or board of directors is reviewing the proceedings, records, or recommendations of a peer review board of the above enumerated organizations."

The following three sentences of § 23–17–25(a) serve to cabin the scope of that privilege:

"[ (1) A]ny imposition or notice of a restriction of privileges or a requirement of supervision imposed on a physician for unprofessional conduct * * * shall be subject to discovery and be admissible in any proceeding against the physician for performing, or against any health care facility or health care provider which allows the physician to perform the medical procedures which are the subject of the restriction or supervision during the period of the restriction or supervision or subsequent to that period[; (2) ] Nothing contained in this section shall apply to records made in the regular course of business by a hospital or other provider of health care information[; and (3) ] Documents or records otherwise available from original sources are not to be construed as immune from discovery or used in any civil proceedings merely because they were presented during the proceedings of the committee."

Section 5–37.3–7(c) includes a similar caveat concerning the discoverability and admissibility of information available from original sources.

It is upon this statutory landscape that this Court has issued two opinions that interpret the precise nature of the peer-review privilege in this jurisdiction; those opinions have been scrutinized closely by the parties in this case. First, we held that the privilege did entitle a hospital to withhold "all records and proceedings" before the peer-review board, even those pertaining to the plaintiff in that case. *Cofone v. The Westerly Hospital*, 504 A.2d 998, 1000 (R.I.1986). In refuting the plaintiff's argument that a health-care provider could use the privilege "as a shield against discovery and liability by simply providing its [peer-review board] with the medical records of plaintiff," we summarized § 23–17–25 as dictating "that only the records and the proceedings which originate with the peer-review board are immune from discovery and inadmissible." *Cofone*, 504 A.2d at 1000.

Next, we held that a doctor was obligated to answer interrogatories requesting the names of those who served on a peer-review board and whether a hospital ever had "restricted, revoked, or curtailed" the doctor's staff privileges. *Moretti*, 592 A.2d at 856, 858. In addition to providing a detailed summary of the peer-review privilege in other jurisdictions, we stated that the pertinent statute should be strictly construed because "privileges, in general, are not favored in the law" and "this immunity from discovery is in derogation of both common-law and the general policy favoring discovery." *Id.* at 857. Furthermore, "[t]he burden of establishing entitlement to nondisclosure rests on the party resisting discovery." *Id.* The public purpose of the peer-review privilege is not served when "the privilege created in the peer-review statute is applied beyond what was intended and what is necessary to accomplish the public purpose." *Id.* "The privilege must not be permitted to become a shield behind which a physician's incompetence, impairment, or institutional malfeasance resulting in medical malpractice can be hidden from parties who have suffered because of such incompetence, impairment, or malfeasance." *Id.* at 857–58.

Read together, *Cofone* and *Moretti* reveal this Court's careful and informed deliberations on the challenging legal issue of where to draw the line between what is privileged and what is discoverable. We now proceed to the arguments raised by defendants.

## 1

### Departure from Existing Precedent

■ Under the principle of *stare decisis,* this Court always makes a concerted effort to adhere to existing legal precedent.

"Perhaps the most important and familiar argument for *stare decisis* is one of public legitimacy. The respect given the Court by the public and by the other branches of government rests in large part on the knowledge that the Court is not composed of unelected judges free to write their policy views into law. Rather, the Court is a body vested with the duty to exercise the judicial power prescribed by the Constitution. An important aspect of this is the respect that the Court shows for its own previous opinions." *State v. Musumeci,* 717 A.2d 56, 68–69 (R.I.1998) (Weisberger, J., concurring in part and dissenting in part) (quoting Lewis F. Powell, Jr., *Stare Decisis and Judicial Restraint,* 1991 Journal of Supreme Court History 13, 16).

Undeterred by that principle, the hospital posits two arguments in which it asks us to "revisit" or depart from the relevant precedents. We first address the hospital's contention that the term "originate," as used in our previous opinions, should be interpreted only to mean "to give rise to," noting the fact that the term "originate" is not found in the relevant statutory language.

■ *Cofone,* 504 A.2d at 1000, states—and *Moretti,* 592 A.2d at 857, reiterates—that the statute affording the peer-review privilege protects "only the records and the proceedings which originate with the peer-review board." That conclusion is supported by the statutory language.

Unquestionably, both statutes protect only "records" and "proceedings" of peer-review boards. Section 23–17–25(a); § 5–37.3–7(c). Both statutes also do not protect "[d]ocuments or records otherwise available from original sources." Section 23–17–25(a); § 5–37.3–7(c) (providing that "[c]onfidential health care information discoverable or admissible from original sources shall not be construed as immune from discovery or use in any proceeding"). Furthermore, both statutes also include other limitations on the scope of the privilege that pertain to information generated by entities other than a peer-review board. Section 23–17–25(a) (providing that "[n]othing contained in this section shall apply to records made in the regular course of business by a hospital or other provider of health care information"); § 5–37.3–7(c) (providing that a witness before a peer-review board cannot be prevented from testifying "as to matters within his or her knowledge * * *, but that witness cannot be questioned about his or her testimony or other proceedings before that medical peer review board or about opinions formed by him or her as a result of those proceedings"). Based on statutory language such as this, we stated that the policy supporting the limitations on the peer-review privilege was to prevent the privilege from becoming "a shield behind which a physician's incompetence, impairment, or institutional malfeasance" could be hidden. *Moretti,* 592 A.2d at 857–58. We conclude that *Cofone* and *Moretti* unquestionably remain viable as binding legal precedent in this jurisdiction: Requiring that information originate from the peer-review board to be protected by the privilege accurately reflects both the statutory language, and the policy evidenced by that language, of the peer-review privilege.[9]

9. We also reject the hospital's intimation, made at oral argument before this Court, that

*Cofone v. The Westerly Hospital,* 504 A.2d 998 (R.I.1986), and *Moretti v. Lowe,* 592 A.2d 855

Despite our previous express conclusion to the contrary, the hospital also contends that the statutes creating the peer-review privilege are remedial in nature, and, therefore, should be liberally construed. This argument draws our attention to two divergent rules of statutory construction. We agree with the hospital that generally "a remedial statute is to be construed liberally." *Asadoorian v. Warwick School Committee*, 691 A.2d 573, 580 (R.I.1997). It is equally true, however, that any legislation " 'in derogation of the common law' " is to be construed strictly. *Providence Journal Co. v. Rodgers*, 711 A.2d 1131, 1134 (R.I.1998); *see also Kelly v. Marcantonio*, 678 A.2d 873, 876 (R.I. 1996) (applying a strict interpretation to the legislative definition of "childhood sexual abuse"). Derogation is not a mere change in the common law, but rather "[t]he partial abrogation or repeal of a law." *O'Sullivan v. Rhode Island Hospital*, 874 A.2d 179, 184–85 n. 9 (R.I.2005) (quoting *O'Grady v. Brown*, 654 S.W.2d 904, 907–08 (Mo.1983)) (holding that a wrongful death statute should be liberally construed).

The basis for the hospital's liberal construction argument is the preamble to P.L. 1986, ch. 350, which amended § 23–17–25. In identifying problems related to an increase in medical malpractice claims, it "declares that it is the policy of this state to promote the free flow of information between health care providers and the various peer review and disciplinary organizations in the health care field." P.L.1986, ch. 350 at 730.

Although we concur with the hospital's assertion that the peer-review privilege works to remedy problems related to medical malpractice, we since have held expressly that the statute creating the peer-review privilege should be strictly construed. *Moretti*, 592 A.2d at 857. Not only are the statutes at issue in this case in derogation of the common law, but also they create a limitation on discovery that often is viewed skeptically in the law. *See id.* Privileges, by their nature, " 'shut out the light' " on " 'the ascertainment of the truth.' " *State v. Almonte*, 644 A.2d 295, 298 (R.I.1994). We disagree with the hospital that a 1986 preamble to a public law recognizing that a statute affords a remedy is sufficient to disturb our well-established caselaw on this point.

Furthermore, this is not the first time that we have concluded that a statute affording a "liberal" remedy nevertheless should be complied with strictly because it is in derogation of the common law. *See Gem Plumbing & Heating Co. v. Rossi*, 867 A.2d 796, 803 (R.I.2005). Finally, regardless of what type of construction we are to give these statutes, it is axiomatic that we should interpret statutory language in accordance with its plain and ordinary meaning. *State v. Menard*, 888 A.2d 57, 60 (R.I.2005). We see nothing in either *Cofone* or *Moretti* to suggest that those opinions have in any way strayed from that maxim of statutory interpretation.

With our past caselaw now firmly entrenched in the present, we proceed to

(R.I.1991), both involved discovery requests for information pertaining only to the respective plaintiffs in those cases. Although this may have been true with respect to *Cofone*, 504 A.2d at 999, the plaintiff in *Moretti*, 592 A.2d at 856, posed an interrogatory to a doctor asking whether her staff privileges ever had been "restricted, revoked, or curtailed at any hospital." This interrogatory was in no way limited to a restriction of privileges resulting from the doctor's treatment of the plaintiff. We therefore cannot distinguish these opinions from the instant case in the manner in which the hospital suggests; instead, *Cofone* and *Moretti* directly apply to this case.

address the additional issues raised in this writ of certiorari.

## 2

### Application of the Peer–Review Privilege

 In a footnote in its brief, the hospital identifies two documents (numbered 138 and 492–543 in the hospital's second supplemental privilege log) that are protected by the peer-review privilege, and it contends that these examples evidence the motion justice's failure to apply the peer-review privilege. Although we disagree with the assertion that the motion justice disregarded the peer-review privilege, the fact that she ordered the production of a transcript of a hearing before a hospital committee and a report of a hospital committee gives us pause.

### i

### The Transcript

In her ruling, the motion justice referred to the transcript, numbered 492–543 in the hospital's second supplemental privilege log. Her ruling seemed to question whether the committee meeting recorded in the transcript in fact qualified as a meeting of a peer-review board:

"[W]ith respect to the transcript that has been presented in these documents, * * * the whole purpose of peer review is to insure quality health care at the hospital. * * * [T]he allegations that [the hospital was] investigating in this matter * * * certainly affect whether the hospital should keep the doctor as a privileged physician, but only in the broadest sense of the term[ ] does it go to quality control and, therefore, those hearings and documents * * * cannot possibly fall under the confidential privileged statute."

Understandably, the motion justice did not elaborate on exactly what the hospital was "investigating in this matter." Our review of this transcript reveals that the committee meeting stemmed from a complaint about Dr. Samson's bedside manner while working in the emergency room; much of the discussion centered on his alleged inability to interact appropriately with a patient and his family member.

Since there is little doubt that this transcript was, in fact, a proceeding before a hospital committee, the question that remains is whether a committee investigating the bedside manner of a doctor qualifies as a peer-review board. As set out in its entirety above, G.L.1956 § 5–37–1(11)(i) defines the function of a peer-review board as follows:

"to evaluate and improve the *quality of health care* rendered by providers of health care service or to determine that health care services rendered were professionally indicated or *were performed in compliance with the applicable standard of care* or that the cost of health care rendered was considered reasonable by the providers of professional health care services in the area." (Emphases added.)

Neither of our previous opinions on the peer-review privilege answers this precise question.

The motion justice's distinction between a doctor's bedside manner and the actual medical care that a doctor administers strikes us as sensible. The peer-review privilege was designed to alleviate an increase in medical malpractice lawsuits for substandard health care, not to reduce the number of rude or uncompassionate health-care professionals—although the latter is certainly a commendable objective. *Cf. Moretti*, 592 A.2d at 858 (reasoning that "[m]aking the fact of loss or restriction of privileges unavailable to the

injured party is not necessary to accomplish the purposes of the peer-review statute and therefore should not be privileged"). Withholding the content of hospital meetings related to a doctor's bedside manner does not seem to effectuate the goals of the peer-review privilege.

We also remain cognizant of the fact that a party asserting the privilege bears the burden of establishing "entitlement to nondisclosure." *Id.* at 857. The hospital fails to point us to the portion of the transcript that discusses Dr. Samson's possible deviation from an appropriate standard of medical care. Instead, the hospital's argument related to the transcript is that if a committee meeting pertains in any way to whether a doctor should be credentialed, the meeting constitutes a proceeding before a peer-review board because it implicates health and safety, and thus the transcript of that meeting should be found to be privileged. In light of our strict construction of the statutes creating the peer-review privilege, we are reluctant to employ such a broad reading of the definition of a peer-review board. *Id.*

Bearing in mind both the hospital's burden and the deference owed to the rulings of a motion justice in situations such as this, we hold that the motion justice did not abuse her discretion in ruling that the transcript of the hospital committee meeting was not protected by the peer-review privilege.

### ii

### The Report

The motion justice did not address specifically the report, numbered 138 on the hospital's second supplemental privilege log. Our review of that document reveals a one-page report summarizing a meeting pertaining to whether Dr. Samson possibly failed to respond in a timely and appropriate manner to a patient who needed treatment in the emergency room. The report contains a list of doctors in attendance, a list summarizing key items discussed in the meeting, and a list of actions taken.

This meeting, in contrast to the meeting recorded by the transcript, focused not on Dr. Samson's bedside manner, but on whether or not he timely responded to a patient who needed care. The meeting, therefore, clearly fits within the definition of a peer-review board because it pertained to whether health-care services "were performed in compliance with the applicable standard of care." Section 5–37–1(11)(i). In turn, a report summarizing the key items discussed at such a meeting is a "record" of a peer-review board that is protected by the peer-review privilege. Section 23–17–25(a); § 5–37.3–7(c). None of the exceptions included in § 23–17–25(a) applies. Even giving the motion justice the proper deference, we must hold that she erred as a matter of law in ordering the hospital to produce the document numbered 138 in its entirety.

We are cognizant, however, of the fact that the report constituting the document numbered 138 may include information that is not protected by the peer-review privilege. To the extent that this document may contain a restriction on Dr. Samson's emergency room privileges, this information clearly is not protected by the peer-review privilege. *Moretti,* 592 A.2d at 858. The list of doctors who attended that meeting similarly is not protected. *Id.* (concluding that "a hospital should, on proper interrogatory, identify all persons who have knowledge of the underlying event that is the basis of the malpractice action regardless of whether these persons sit on a peer-review committee or have presented evidence to a peer-review com-

mittee"). Accordingly, this report is not privileged, and is discoverable, so long as it is redacted to cloak the summary of key items discussed in the meeting.

Finally, although we agree with the hospital regarding this particular document, we are surprised to find that the hospital's brief fails to identify any of the other allegedly privileged documents, and to argue that those, too, are protected by the peer-review privilege. At best, the hospital's brief states that document numbered 138 is "an example" of the privileged material that the motion justice ordered it to produce. Since we are bound under the applicable standard of review to "'scour the record'" to find evidence to *affirm* the findings of the motion justice, *Cullen*, 850 A.2d at 903, we will not scour the record in an attempt to find other privileged documents, which the hospital itself has failed to identify, to *reverse* the findings of the motion justice.

### 3

### Discovery From Original Sources

■ Both the hospital and Dr. Samson assert that the statutes creating the peer-review privilege require a plaintiff to obtain access to information that was gathered by a peer-review board from original sources directly from those original sources rather than from the peer-review board.

One of the limitations on the scope of the peer-review privilege contained in § 23–17–25(a) is that "[d]ocuments or records otherwise available from original sources are not to be construed as immune from discovery or used in any civil proceedings merely because they were presented during the proceedings of the committee." Similarly, § 5–37.3–7(c) provides: "Confidential health care information discoverable or admissible from original sources shall not be construed as immune

from discovery or use in any proceeding merely because that information was presented during proceedings before [the peer-review board]."

We disagree with the hospital's and Dr. Samson's reading of these provisions. The clear language of the statutes renders information gathered from original sources not privileged, and therefore discoverable and admissible. Those provisions erect an outer limit on the peer-review privilege, and, in doing so, prevent the privilege from functioning as a shield. *Cofone*, 504 A.2d at 1000. In turn, nothing in the applicable statutory provisions or our caselaw can be read to require a plaintiff to obtain access to information considered by the peer-review board from the original source that produces that information. Put more simply, the "original source" language is a limitation on the scope of the privilege afforded a health-care provider, rather than a definition of plaintiff's exclusive avenue of discovery. To oblige a plaintiff to track down the original source of unprivileged information that is within the custody of a party to the dispute would be to require burdensome labor for no good reason. We hold that § 23–17–25(a) and § 5–37.3–7(c) do not require a plaintiff to obtain access to information from its original source.

### 4

### Peer–Review Privilege and Negligent Credentialing

■ Doctor Samson urges us to address the relationship between the peer-review privilege and the negligent credentialing cause of action. The hospital also draws our attention to plaintiff's negligent credentialing claim. We feel compelled to explore these legal issues fully in light of the motion justice's repeated declaration that the peer-review privilege is incompati-

ble with a negligent credentialing cause of action.

This jurisdiction has adopted "the doctrine of corporate negligence as a theory of hospital liability," which the parties in this case refer to as "negligent credentialing." *Rodrigues v. Miriam Hospital,* 623 A.2d 456, 463 (R.I.1993). In *Rodrigues,* a case involving a doctor's refusal to perform a tracheostomy, the plaintiff argued that the hospital should have known that the doctor might refuse to perform the procedure, and, therefore, it should not have granted that doctor staff privileges. *Id.* at 463–64. We affirmed the directed verdict (now judgment as a matter of law) in favor of the hospital because there was no evidence to suggest that the hospital knew or should have discovered the doctor's "reluctance or inability to perform tracheostomies." *Id.* at 464.

 A corporate negligence claim differs from a respondeat superior claim "in that it imposes on the hospital a nondelegable duty owed directly to the patient that is independent of the doctor-hospital relationship." *Id.* at 462. A hospital or other health-care provider may be held liable "for the failure to exercise reasonable care in hiring" one of its employees or in extending staff privileges to a doctor. *Id.* at 463. Such a failure occurs when a hospital selects a person "unfit or incompetent for the employment, thereby exposing third parties to an unreasonable risk of harm." *Id.* A plaintiff must show, however, " 'that the hospital had actual or constructive knowledge of the defect * * * which created the harm.' " *Id.* at 464.

 Although we agree with Dr. Samson's point that our recognition of a cause of action cannot override the statutorily created peer-review privilege, we fail to see precisely how the privilege protecting the "proceedings" and "records" of a peer-review board disrupts a patient's abil-

ity to bring a corporate negligence claim against a health-care provider. First, it is essential to remain mindful of our holding that information relating to whether a doctor's privileges have been lost or restricted is not protected by the peer-review privilege. *Moretti,* 592 A.2d at 858. "Making the fact of loss or restriction of privileges unavailable to the injured party is not necessary to accomplish the purposes of the peer-review statute and therefore should not be privileged." *Id.* The production of this information will do much to facilitate a corporate negligence claim because it will chronicle highly relevant facts—specifically, actions taken by the health-care provider, if any, to police its employees or agents.

Furthermore, we also agree with the motion justice that patient complaints made to a hospital similarly are not protected by the peer-review privilege. By their nature, complaints precede the convening of a peer-review board and are formulated not by the peer-review board, but by patients or their families. We would have to stretch beyond the breaking point the meaning of the term "proceedings" or "records" in order to conclude that patient complaints are privileged. They are more in the nature of "documents or records otherwise available from original sources," § 23–17–25(a); a hospital, therefore, may not render a patient complaint privileged and undiscoverable by passing it along for consideration by a peer-review board.

 To summarize, a plaintiff asserting a claim of corporate negligence against a health-care provider is entitled to discovery of patient complaints, even when those complaints lead to peer-review proceedings and ultimately to any possible limitations or restrictions placed on a doctor's privileges. Using that information and other

relevant and unprivileged information, a plaintiff then must cultivate his or her claim that the health-care provider has hired or retained an incompetent or unfit employee and that the provider had actual or constructive knowledge of that incompetence or unfitness.

In concluding as we do on this issue, we also take this opportunity to clarify how an applicable statute should be interpreted in light of our recognition of a corporate negligence cause of action. At the argument on the motion to compel, there was discussion about whether a corporate negligence claim sufficed, under § 5–37.3–7(d), as an action "where * * * the legal entity which formed [a peer-review] board * * * is sued for actions taken by that board." If so, then the peer-review privilege, or at least the privilege created by § 5–37.3–7(c), would not apply whenever a plaintiff asserts a claim of corporate negligence.

Section 5–37.3–7(d) reads:

"The provisions of [§ 5–37.3–7(c)] limiting discovery and testimony *shall not apply in any legal action* brought by a medical peer review board to restrict or revoke a physician's hospital staff privilege, or his or her license to practice medicine, or to cases where a member of the medical peer review board or the legal entity which formed this board or within which that board operates is sued for actions taken by that board; provided, that in this legal action personally identifiable confidential health care information shall not be used without written authorization of the person or his or her authorized representative or upon court order." (Emphasis added.)

Read in its entirety, this statutory provision limits the peer-review privilege as it pertains to lawsuits between a health-care provider and its physicians over staff privileges. In this sense, the provision re-

sembles Article V, Rule 1.6(b)(2) of the Supreme Court Rules of Professional Conduct, which renders the attorney-client privilege inapplicable when a lawyer attempts "to establish a claim or defense on behalf of the lawyer in a controversy between the lawyer and the client." We are reluctant to read this exception to the privilege more broadly than that.

■ Furthermore, we cannot interpret a statute in a way that will lead to an absurd result. *Menard*, 888 A.2d at 60. If we were to interpret the language of § 5–37.3–7(d) to include corporate negligence claims, then a plaintiff need only assert a claim of corporate negligence, pursuant to our liberal pleading standards, to evade the protections afforded to a health-care provider by our peer-review privilege. A rule of law allowing a plaintiff to eviscerate the peer-review privilege through artful pleading would be an absurdity. This Court did not intend that result when it recognized the doctrine of corporate negligence in *Rodrigues*, 623 A.2d at 463. In clarifying the relationship between a corporate liability action and the peer-review privilege, we think that the best course of action is to ensure that § 5–37.3–7(d) is not interpreted to do serious harm to the peer-review privilege, which, to reiterate, aims to foster high quality medical care through "open discussions and candid self-analysis in peer-review meetings." *Moretti*, 592 A.2d at 857.

### 5

### Severance of Negligent Credentialing Claim

Doctor Samson requests that this Court also address the legal issue of whether the negligent credentialing claim should be severed from the rest of the negligence claims. Although this separate motion was heard simultaneously with arguments

pertaining to the various privileges, we decline the opportunity to expound on this point of law in the context of this writ of certiorari. The motion justice denied the hospital's motion for severance without prejudice. This is in stark contrast to the discovery-related issues, where, if we had not granted this petition for writ of certiorari and had allowed the discovery process to continue, then any subsequent decision by this Court concluding that some of the documents were privileged would have been too little, too late. Although we certainly do not deem the idea of severance in this context to be frivolous, we will limit this opinion to those privilege-related matters.

## B

### Other Privileges

In her bench decision ordering the production of roughly 750 pages of documents, the motion justice discussed only the peer-review privilege, to the exclusion of the other privileges asserted by the hospital— specifically, the attorney-client privilege, the Confidentiality of Health Care Information Act, and the confidential records of the board of medical licensure and discipline. We address each privilege below.

### 1

### Attorney–Client

 We think the most prudent action is to remand this case for an on-the-record elucidation of the findings of the motion justice with respect to this well-established privilege. " '[C]ommunications by a client to his attorney for the purpose of seeking professional advice, as well as the responses made by the attorney to such inquiries, are privileged communications not subject to disclosure.' " *State v. Grayhurst*, 852 A.2d 491, 512 (R.I.2004). We have held that the attorney-client priv-

ilege "must be narrowly construed because it limits the full disclosure of the truth." *Callahan v. Nystedt*, 641 A.2d 58, 61 (R.I. 1994). "The mere existence of a relationship between attorney and client does not raise a presumption of confidentiality." *Id.* "[T]he burden of establishing these elements is on the party advancing the privilege." *State v. von Bulow*, 475 A.2d 995, 1005 (R.I.1984). Further, the "privilege may be waived through disclosure of a confidential communication to a third party." *Rosati v. Kuzman*, 660 A.2d 263, 266 (R.I.1995). With these principles in mind, we remand this case to the motion justice for a hearing to determine whether those documents claimed to be privileged fall within the attorney-client privilege.

### 2

### Confidential Health–Care Information

 Similarly, further explanation by the motion justice is needed concerning whether the privilege created by the Confidentiality of Health Care Information Act insulates any of the 750 pages of documents. This Court has had occasion to delimit the application of the act in judicial proceedings.

In *Bartlett v. Danti*, 503 A.2d 515 (R.I. 1986), this Court declared § 5–37.3–6 unconstitutional because it rendered confidential health-care information not subject to compulsory legal process in any judicial proceedings. *Bartlett*, 503 A.2d at 517. We held that this prohibition intruded upon the judicial power and violated the separation of powers guarantee of the Rhode Island Constitution because it "remove[d] from the court's discretion the determination of admissibility of otherwise relevant evidence." *Id.* We later declared unconstitutional a similar statute "enacted a few months subsequent to our decision in *Bartlett* in an obvious attempt to avoid our declaration of unconstitutionality * * *."

*Almonte*, 644 A.2d at 298. In doing so, this Court could not "allow the Legislature to create such a sweeping privilege with regard to health-care information as to cripple the ability of the Judiciary to try and determine a wide range of civil and criminal cases." *Id.*

We since have described *Almonte* as holding that the Legislature was not precluded from legislating in this area, but could not enact a statute that "unequivocally impinge[d] upon the power of the Judiciary in carrying out its fact finding function." *In re Doe Grand Jury Proceedings*, 717 A.2d 1129, 1132 (R.I.1998). The Legislature responded to our holding in *Almonte* by enacting § 5–37.3–6.1, a third attempt to harmonize the need to protect confidential health-care information with the exclusive authority of the Judiciary to decide the admissibility of evidence in its tribunals. *See Washburn v. Rite Aid Corp.*, 695 A.2d 495, 498 n. 5 (R.I.1997). Section 5–37.3–6.1 sets forth a statutory procedure for the disclosure of confidential health-care information in connection with judicial proceedings. Section 5–37.3–6.1 provides, in relevant part:

"(a) Except as provided in § 5–37.3–6, *a health care provider or custodian of health care information may disclose confidential health care information in a judicial proceeding* if the disclosure is pursuant to a subpoena and the provider or custodian is provided written certification by the party issuing the subpoena that:

"(1) A copy of the subpoena has been served by the party on the individual whose records are being sought on or before the date the subpoena was served, together with a notice of the individual's right to challenge the subpoena; or, if the individual cannot be located within this jurisdiction, that an affidavit of that fact is provided; and

"(2) Twenty (20) days have passed from the date of service on the individual and within that time period the individual has not initiated a challenge; or

"(3) Disclosure is ordered by a court after challenge. \* \* \*." (Emphasis added.)

This Court, in *In re Doe Grand Jury Proceedings*, 717 A.2d at 1132, noted that the Confidentiality of Health Care Information Act "was intended 'to establish safeguards for maintaining the integrity of confidential health-care information *that relates to an individual.*'" *Id.* (quoting *In re Grand Jury Investigation*, 441 A.2d 525, 528 (R.I.1982)) (emphasis added). We concluded that § 5–37.3–6.1 struck "a permissible balance between a party's interest in maintaining the confidentiality of his or her personal health care records and the court's need to access relevant information." *Doe*, 717 A.2d at 1133. Thus, at least with respect to known, personally identifiable health-care records, § 5–37.3–6.1 sets forth a procedure by which the person whose records are sought is provided notice and an opportunity to contest their production or seek to limit their disclosure or use. That is not the situation with which we currently are faced.

The plaintiff in this case has not sought health-care records personally identifiable to a particular patient. Rather, plaintiff requested information that was reviewed by the hospital in the course of its credentialing decisions. Thus, because the individuals whose records defendants assert are privileged have not been identified to plaintiff, compliance with § 5–37.3–6.1 is impossible. The plaintiff cannot be expected to serve a copy of a subpoena on an unknown putative patient or to obtain his or her acquiescence to access an as-yet-unidentified document. Moreover, plaintiff is attempting to prove that the hospital negligently credentialed Dr. Samson, a

claim that can be proved without the need to identify a particular individual.

In response to the hospital's claim that some documents were protected by the Confidentiality of Health Care Information Act, plaintiff requested and was granted an *in camera* review of the records. The motion justice ordered the disclosure of all documents without identifying any confidential health-care records, although she ordered that some records be redacted.

▆▆▆ The Confidentiality of Health Care Information Act is not a shield behind which a medical provider may hide to avoid liability for medical negligence or for any other purpose. *Cf. In re Grand Jury Investigation*, 441 A.2d at 531–32 (holding that the Confidentiality of Health Care Information Act cannot be used to prevent the subpoenaing of a physician's records of a patient's treatment during a criminal investigation of alleged Medicaid fraud, and the privilege must give way to fraud investigations). This Court has declared that privileges do not aid the quest for truth, the core function of the adversary process, *see Almonte*, 644 A.2d at 298, and, therefore, privileges should narrowly be construed, *see von Bulow*, 475 A.2d at 1006 ("Because the attorney-client privilege limits the full disclosure of the truth, it must be narrowly construed."); *see also University of Pennsylvania v. Equal Employment Opportunity Commission*, 493 U.S. 182, 189, 110 S.Ct. 577, 107 L.Ed.2d 571 (1990) ("We are especially reluctant to recognize a privilege in an area where it appears that Congress has considered the relevant competing concerns but has not provided the privilege itself.").

Accordingly, we are of the opinion that *in camera* review and redaction of personally identifying patient information is an appropriate procedure to decide whether the documents should be produced. However, the trial justice failed to make a record finding about which documents, if any, met the definition of personally identifiable confidential health-care information as set forth in § 5–37.3–3(13), and, if so, whether the records could be produced after they were redacted. We remand this case for that determination.

3

## Records of the Board of Medical Licensure and Discipline

▆▆▆ It is not necessary that the motion justice address on remand the hospital's argument that certain documents are not discoverable pursuant to G.L.1956 § 5–37–5.2 because they are records of the board of medical licensure and discipline. Section 5–37–5.2(a) pertains to complaints made to that board, as defined by § 5–37–1(1), concerning the unprofessional conduct of a licensed medical professional. Section 5–37–5.2 reads, in pertinent part:

"(a) Any person, firm, corporation, or public officer may submit a written complaint to the board charging the holder of a license to practice medicine or limited registrant with unprofessional conduct, specifying the grounds for the complaint. The board shall review all complaints.

"(b) If the board determines that the complaint merits consideration, or if the board, on its own initiative without a formal complaint, has reason to believe that any holder of a license or limited registration to practice medicine may be guilty of unprofessional conduct, the chairperson shall designate three (3) members of the board at least one of whom shall be a public member, to serve as a committee to investigate the complaint. * * *

"(c) The investigating committee shall conduct its deliberations and make rec-

ommendations regarding the complaint to the board. .

"(d) No member of the board who participated in the investigation may participate in any subsequent hearing or action taken by the remainder of the board. *Investigations shall remain confidential and all initial hearings, investigatory hearings, and full hearings before the board shall remain confidential.*" (Emphasis added.)

We previously have interpreted another statute as failing to create a testimonial privilege, despite the fact that it required records of a state agency to remain "confidential." *Mallette v. Children's Friend and Service,* 661 A.2d 74, 76 (R.I.1995). Regardless of a clear legislative intent to protect the privacy interests of certain parties, we were hesitant to glean "a privilege by implication" from the statute in light of our need to construe privileges strictly. *Id.*

We interpret § 5–37–5.2 in an identical manner. The mere reference in this statute to the confidential nature of investigatory records of the board of medical licensure and discipline is insufficient to create a statutory privilege. Despite the Legislature's intent to make these investigative records confidential, we do not think it is wise to interpret this as a privilege through statutory implication. Accordingly, we hold that § 5–37–5.2 does not create a statutory privilege.[10] We therefore affirm the decision of the motion justice with respect to the hospital's assertion of a privilege under that statute.

### Conclusion

For the foregoing reasons, we affirm in part and reverse in part. Concerning the peer-review privilege, we affirm the order of the Superior Court with respect to all the documents, save document numbered 138, at least portions of which we hold to be privileged. We also affirm the order with respect to the records of the board of medical licensure and discipline. Concerning the attorney-client privilege and the Confidentiality of Health Care Information Act, we quash the order and remand for a record determination of which documents, if any, fall within the attorney-client privilege, an *in camera* inspection, and, where appropriate, redaction of any records found to be personally identifiable confidential health-care information. The case is remanded to the Superior Court for proceedings not inconsistent with this opinion.

Justice FLAHERTY did not participate.

---

10. The plaintiff also argues that, even if we were to find that these records were privileged, the hospital would not have standing to assert that privilege. In holding as we do on this issue, we need not reach plaintiff's secondary assertion.